# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### CENTRAL DIVISION

CHRISTIAN PEYTON, SALEM ZAHN, and
ERNEST EASTER, on behalf of themselves
and all others similarly situated,

                        Plaintiffs,

v.

VETERANS UNITED HOME LOANS,
REALTY SEARCH SOLUTIONS, LLC (d/b/a
VETERANS UNITED REALTY), and
MORTGAGE RESEARCH CENTER, LLC,
Missouri Corporations,

                        Defendants.

Case No.: 2:26-cv-04039

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................... 1

II.  PARTIES ...................................................................................................... 5

    A.   Plaintiffs ............................................................................................. 5

        i.    Plaintiff Christian Peyton ........................................................ 5

        ii.   Plaintiff Salem Zahn ............................................................... 6

        iii.  Plaintiff Ernest Easter ............................................................ 6

    B.   Defendants ........................................................................................ 7

III. JURISDICTION AND VENUE .................................................................. 8

IV.  FACTUAL ALLEGATIONS ....................................................................... 9

    A.   Real Estate Industry Background ...................................................... 9

    B.   Background on VA-Backed Loans .................................................. 11

    C.   Veterans United's Fraudulent Conduct and Illegal Steering ............... 11

    D.   Testimonials from Current Real Estate Agents and Loan Officers ..... 19

        i.    Confidential Real Estate Agent 1 ........................................... 19

        ii.   Confidential Real Estate Agent 2 ........................................... 20

        iii.  Confidential Real Estate Agent 3 ........................................... 21

        iv.   Confidential Real Estate Agent 4 ........................................... 22

        v.    Confidential Loan Officer 1 .................................................... 22

        vi.   Confidential Loan Officer 2 .................................................... 23

    E.   The Harmful and Long-Lasting Economic Impacts of Veterans United's Steering ............................................................................... 24

V.   CLASS ACTION ALLEGATIONS ........................................................... 25

VI.  TOLLING THE STATUTES OF LIMITATIONS ...................................... 28

VII. CLAIMS FOR RELIEF ............................................................................. 29

COUNT I: VIOLATION OF THE REAL ESTATE SETTLEMENT
    PROCEDURES ACT, 12 U.S.C. 2607(A) (ON BEHALF OF A
    NATIONWIDE CLASS) .................................................................................. 29

COUNT II: VIOLATION OF THE REAL ESTATE SETTLEMENT
    PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A
    NATIONWIDE CLASS) .................................................................................. 32

COUNT III  VIOLATIONS OF THE MISSOURI MERCHANDISING
    PRACTICES ACT (MO. REV. STAT. § 407.010 *ET SEQ.*) .......................... 35

COUNT IV  UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE
    CLASS) ............................................................................................................ 37

REQUEST FOR RELIEF ......................................................................................... 38

DEMAND FOR JURY TRIAL ................................................................................ 38

Plaintiffs Christian Peyton, Salem Zahn, and Ernest Easter bring this action on behalf of themselves and on behalf of the proposed Class, defined below, and allege upon information and belief and the investigation of counsel as follows:

## I. INTRODUCTION

1. The U.S. Veterans Administration ("VA") runs an essential program for Veterans and active U.S. military looking to buy a house: the VA serves as guarantor for part of the mortgage, which makes it easier for borrowers to purchase a home. Veterans and active U.S. military have accordingly grown to trust and rely on VA home loans as an essential part of becoming a homeowner.

2. Veterans United Home Loans and the remaining Defendants have capitalized on and exploited the demand of military members and Veterans for mortgages by falsely presenting itself as part of the VA. It is not: Veterans United is a private for-profit corporation that has no affiliation with the government whatsoever, founded and run by three individuals with no military service. But its website is intentionally designed to mislead home buyers into believing that it is part of the VA, based in part on its promotion that it is "The Nation's #1 VA Lender":



3.     As detailed below, multiple real estate and loan officers have confirmed the deceptive nature of this advertising:  they routinely lose business to Veterans United because customers—veterans and active U.S. military—believe that they need to use Veterans United because it is "part of" the VA.

4.     The deception does not end at Veterans United's website.  Veterans United has a network of "preferred" agents throughout the country who do not work for Veterans United, but who receive referrals (or "leads") from Veterans United.  If the lead closes on a house, these preferred agents pay Veterans United a substantial proportion (around 35%) of their commission.  These agents are also *required* to steer their clients to use Veterans United for their home loans.  If the agents do not do so, they stop receiving leads.

5.     The harm from this deception is compounded by the fact that Veterans United loans are more costly and have higher interest rates compared to what home buyers could obtain with other lenders.  Veterans United also offers less financial aid packages compared to its competitors.

6.     Veterans United's fraudulent conduct has been confirmed by a half dozen real estate agents and loan officers, from across the country, who have first-hand experience with VA Home Loans.  According to these agents and loan officers:

- Veteran United's steering practices are a disservice to its clients in the military because Veteran United's loan packages are more expensive than its competitors. Veterans United also does not provide information to its clients about additional options they have to finance the purchase of their homes, including first time home buyer assistance programs.

- Clients who are active military or Veterans believes that Veterans United is "the VA." This is a predatory practice, because Veterans United is deceiving clients into believing that Veterans United is part of the federal government, and taking advantage of these first-time home buyers who believe they must work with a "VA agent" to secure the loan.

- Veterans United's steering practices increase costs for active military customers, which is a particular disservice to this community, who typically do not have sufficient capital to cover these costs. Veterans United's excessive closing costs get wrapped into the loan, which results in a larger loan and larger loan payments.

- Defendant Veterans United Realty does not have active real estate agents on staff who buy and sell houses; it is formed simply to collect the 35% the preferred agents pay Veterans United.

- Veterans United preferred agents do not provide their clients with alternate lending options other than Veterans United because, if they did, they would be dropped from the program.

7.     Defendants' conduct as alleged herein violates federal statutes that seek to promote transparency and accountability in the real estate industry, in at least two respects. *See* Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607. ***First***, Veterans United's practice of providing leads to agents in exchange for pushing clients to Veterans United Home Loans is blatant steering not permitted by RESPA. Veterans United and participating agents reciprocally give and receive a "thing of value," in violation of RESPA. *See* 12 U.S.C. § 2607(a). Referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions." 12 C.F.R. § 1024.14(d). Veterans United and the agent network are engaged in a perpetual loop of illegal referrals and kickbacks, as illustrated below:



3

8.      ***Second***, by requiring preferred agents to pay the undisclosed 35% fee, Defendants are further violating RESPA because Defendants are receiving a payment that is not in exchange for completing the property transaction; it is simply a payment that the preferred agents have to pay Defendants to avoid being dropped from the network.  RESPA prohibits receiving payments that are not "in connection with a transaction involving a federally related mortgage loan."  12 U.S.C. 2607(b).  The 35% payments are not in connection with the closing of the property sale, and Plaintiffs are entitled to treble damages under the statute. *See* 12 U.S.C. § 2607(d)(2).

9.      Defendants' conduct also constitutes a violation of Missouri's consumer protection laws, which prohibit "any deception . . . [or] unfair practice, or the concealment . . . of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. "Merchandise" is defined by statute to include "real estate or services." *Id.* § 407.020.4. Defendants designed their websites to trick potential home buyers into believing that they were working with "the VA," or at least with someone affiliated with the VA or the federal government.  Defendants also unfairly and deceptively did not disclose to the home buyers that Veterans United is receiving approximately 35% of the preferred agents' commission at the end of the transaction—facts that the buyers would want to know as they negotiate the sale of the property.

10.     Defendants have also unjustly enriched themselves through their conduct.  They engaged in patently unfair and deceptive behavior and obtained a windfall of ill-gotten gains as a result.  Defendants are liable to Plaintiffs and the Class for all profits earned from their deceitful conduct.

11.     Plaintiffs, on behalf of themselves and all persons in the United States who, since January 1, 2020, purchased a home financed by Veterans United Home Loans, bring this action for Defendants' violations of RESPA, the Missouri Merchandising Practices Act, and common law unjust enrichment.  Plaintiffs seek treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II.     PARTIES

### A.     Plaintiffs

#### i.     Plaintiff Christian Peyton

12.     Plaintiff Christian Peyton is a Veteran and resident of Gallatin, Tennessee.  Plaintiff Peyton served in the U.S. Army Reserve and U.S. Army National Guard for several years, with an honorable discharge in 2007.  Plaintiff Peyton currently receives 100% permanent and total disability benefits from the VA.  On May 17, 2022, Plaintiff Peyton used Veterans United Home Loans to purchase a property in Gallatin. Plaintiff Peyton initially used Veterans United Home Loans to get pre-approval, and then Veterans United Home Loans referred him to a Veterans United associated real estate agent to purchase the property. The agent did not tell Plaintiff Peyton that the agent had to pay a substantial portion of his/her commission back to Veterans United, or that the agent was required to steer Plaintiff to close with Veterans United Home Loans. Plaintiff Peyton believed that Veterans United was part of the VA, because Veterans United advertised itself as the "Top VA Leader," and the emails and signature blocks emphasize its Veterans affiliation and the veteran status of the loan officer. As detailed herein, Plaintiff Peyton overpaid for his loan as a result of Defendants' illegal steering and unfair business practices, and the preferred agents' payments of 35% of their commission back to Veterans United.

### ii.    Plaintiff Salem Zahn

13.    Plaintiff Salem Zahn is a Veteran and a resident of Bedford, Texas. Plaintiff Zahn served in the U.S. Marine Corps for four years as a Logistics Man and was honorably discharged with the rank of Corporal. On August 15, 2025, Plaintiff Zahn used Veterans United Home Loans to purchase a property in Bedford, using real estate agent J.C. J.C. did not tell Plaintiff Zahn that J.C. had to pay a substantial portion of the agent's commission back to Veterans United, or that J.C. was required to steer Plaintiff Zahn to close with Veterans United Home Loans. Plaintiff Zahn used Veterans United Home Loans because she assumed, based on the name, that it would prioritize her interests and look out for her. However, Plaintiff Zahn has had substantial electrical problems at her home and believes that the Veterans United Home Loans appraiser did not adequately appraise her property. As detailed herein, Plaintiff Zahn overpaid for her loan as a result of Defendants' unfair business practices, and the preferred agents' payments of 35% of their commission back to Veterans United.

### iii.    Plaintiff Ernest Easter

14.    Plaintiff Ernest Easter is a Veteran and a resident of Lansdale, Pennsylvania. Plaintiff Easter served in the U.S. Army for seven years, including as the Chief Signal Specialist, and was responsible for information network security. He received an honorable discharge. On September 30, 2022, Plaintiff Easter used Veterans United Home Loans to purchase a property in Landsdale. Plaintiff Easter used Veterans United Home Loans because he assumed it was part of the VA. As detailed herein, Plaintiff Easter overpaid for his loan as a result of Defendants' unfair business practices, and the preferred agents' payments of 35% of their commission back to Veterans United.

## B.     Defendants

15.     Defendant Veterans United Home Loans is registered as a "Fictitious Name" with the Missouri Secretary of State, with its principal place of business at 1400 Forum Blvd, Suite 18, Columbia, Missouri. Veterans United Home Loans is 100% owned by Mortgage Research Center, LLC.

16.     Defendant Mortgage Research Center, LLC is a Missouri corporation with its principal place of business at 1400 Forum Blvd, Suite 18, Columbia, Missouri.  Its registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.  On November 19, 2002, it was originally incorporated as Pinnacle Financial Consultants, LLC, with Brock Bukowsky and Brant Bukowsky as the founding members.  It changed its name to Mortgage Research Center, LLC on June 7, 2004.  Brant Bukowsky is identified on his LinkedIn profile as the "Co-Founder" of Veterans United Home Loans.  Based on his LinkedIn profile, he has not served in the military.[1]  Brock Bukowsky is identified on his LinkedIn profile as the "Co-Owner" of Veterans United Home Loans.  Based on his LinkedIn profile, he has not served in the military.[2]  Nathan Long is identified as the CEO of Veterans United Home Loans on his LinkedIn profile; based on his profile, he has not served in the military.[3]

---

[1] https://www.linkedin.com/in/brantbukowsky/.

[2] https://www.linkedin.com/in/brockbukowsky/.

[3] https://www.linkedin.com/in/nathan-long-b07a446/. *See also* https://www.facebook.com/groups/ClubWealth/posts/2860838370768662/ ("Did you know that veterans united isn't even owned or was created by a veteran lmao.  Just a couple [guys] that decided to create a company tgat [sic] leads people to believe its owned and operated by a veteran.  Just a fun fact.); *id.* ("definitely a predatory lender.  Too many Veterans think they are a direct connect to VA!").

17.     Realty Search Solutions, LLC has its principal place of business at 1512 Heriford Road, Columbia, Missouri.  Its registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.  It is doing business as Veterans United Realty.

### III.     JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises from violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 USCS § 2601, *et seq.* The Court has subject matter jurisdiction over the unjust enrichment and Missouri consumer protection claims under 28 U.S.C. § 1367 as these claims are so related to the violations of RESPA that it forms part of the same case or controversy.

19.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

20.     This Court has personal jurisdiction over each of the Defendants because these Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) their principal place of business in this District; (4) had substantial contacts with the United States, including in this District; and (5) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

21.     Venue is proper in this District because each Defendant transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These Defendants also market and sell products and services in this District, have had continuous and systematic contacts with this District, and

8

engaged in illegal steering conduct that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.  FACTUAL ALLEGATIONS

### A.  Real Estate Industry Background

22.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

23.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. As a result, a real estate brokerage's contracts with sellers and buyers are required to be with its brokers, not agents, and all payments to individual realtors or agents pass through the brokers.

24.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

25.     A seller broker's compensation is set forth in a listing agreement, which is a contract between the seller and the seller broker. The listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

26.     When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

27.     If the buyer has a broker, the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

28.     As a result, the buyer brokers and agents—who are supposed to assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent. According to industry insiders, there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[4] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[5]

29.     Real estate agents are state-licensed professionals who are obligated by law and professional ethics to act in their clients' best interests. Licensed agents must complete required education, pass state examinations, and comply with state licensing laws that recognize their fiduciary duties of loyalty and full disclosure to their clients. Agents may work independently or under the supervision of licensed brokers, but in all cases, their professional role is to advise clients impartially and to avoid conflicts of interest.  As a result, real estate agents owe fiduciary duties of loyalty, care, and full disclosure to the clients they represent. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice.

---

[4] FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-1/ftc-doj_residential_re_brokerage _competition_workshop_transcript_segment_1.pdf (last visited Aug. 22, 2025).

[5] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf   (last visited Aug. 22, 2025).

**B.      Background on VA-Backed Loans**

30.      The VA Home Loans program is designed to support veterans and service members in buying their home.  The VA acts as a guarantor for a portion of the borrower's loan, thereby allowing the borrower to qualify for loans that he or she may not otherwise obtain.  The VA Home Loans program is often used to obtain home loans with no money down.[6]

31.      Although the loans are partially backed by the Veterans Administration, the borrowers use private mortgage brokers—just as anyone else does in buying a home. To that extent, although there is some paperwork involved in obtaining "automatic" VA lending authority, there is otherwise no unique connection between a broker who offers VA home loans and the U.S. government, including the VA.[7]  As detailed herein, however, Veterans United creates the false impression that it is uniquely situated to provide VA-backed loans.

**C.      Veterans United's Fraudulent Conduct and Illegal Steering**

32.      As noted above, Veterans United falsely presents itself as being part of the VA. The front page of the Veterans United Home Loans website (veteransunited.com) features images that resemble the American flag in two locations—in its logo, and on the keychain presumably holding the key to the buyer's home. The website's most prominent text promotes itself as "The Nation's #1 VA Lender," with a tiny disclaimer at the top, in light blue lettering that blends into the background (red border added here):

---

[6] https://www.benefits.va.gov/homeloans/index.asp.

[7] https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000314438/VA-Pamphlet-VAP26-7-Chapter-01-Lender-Approval-Guidelines.



33.     There is no reason for this miniscule, hidden disclaimer *other* than to fool home buyers into believing that it is part of, or affiliated with, the VA.  Indeed, Veterans United has the highest volume of VA loans because home buyers assume that Veterans United is part of the VA based on Veteran United's misleading advertising.  This is no accident:  as detailed below, real estate agents and loan officers confirm that Veterans United's success *depends* on misleading active U.S. military and Veterans that they are dealing with "the VA," or at least an entity affiliated with the VA.  Individual Plaintiffs in this case concur.  *See supra* § II.A.  In reality, Veterans United has the same connection to the VA as any other mortgage broker who is qualified to offer VA loans.

34.     By clicking the yellow "Continue" button on the home screen, the Veterans United Home Loans website (veteransunited.com) guides the user through a series of questions that are designed to gather intelligence on the home buyer to feed to the "preferred" agents in Veterans United's network; they are unrelated to assessing whether the home buyer is qualified to get a loan. For example, if the user expresses an interest in getting a loan, Veterans United Home Loans asks the following questions:



13



35.     These questions serve no purpose other than to feed information to "preferred" real estate agents. The questions give the preferred agents information about the customers, so they can convince customers to use them to buy a home. Veterans United wants customers to use the preferred agents because it receives a 35% kickback from the preferred agent, and the preferred agent helps ensure that Veterans United Home Loans is ultimately used for the home buyer's mortgage.

36.     Veterans United also has a real estate business, Veterans United Realty.  Based on the fact that Veterans United Realty does not appear to have practicing real estate agents on staff, this business appears to have been created only to evade restrictions on payments from brokers to non-brokers. Veterans United Realty is a shell company whose website is just as misleading as Veterans United Home Loans' website.[8] Veterans United Realty's website does not contain any disclaimer on the top of the screen at all:[9]

---

[8] In fact, if a user clicks on the "Careers" icon at the bottom of the Veterans United Realty website, the user is directed to Veterans United Home Loans. *See https://careers.veteransunited.com/teams/veterans-united-realty/.*

[9] https://www.veteransunitedrealty.com/lp/v2/?src=vurppc&adg=123981392542&desc=availa ble&cmp=brand&matchtype=e&adid=683611482888&targetid=aud-2356546975607:kwd-

14



37.     The user would need to scroll to the bottom to see any disclaimer, again written in light blue font against a dark blue background:



313423381829&campaignid=14490247100&label=&extid=&phyloc=9060414&gad_source=1&
gad_campaignid=14490247100&gbraid=0AAAAABOdbkfBCjD28BnU_eOBXSPreGl32&gclid
=CjwKCAiAtLvMBhB_EiwA1u6_PiIYpzPBSbJFTSh47_X1hoX1r_fY48ffM68nu7lOrJtH6zwu
_YA0BBoCTBMQAvD_BwE.

38.     Just as with Veterans United Home Loans, there is no reason to make the disclaimer so tiny other than to deceive.

39.     Equally deceptive is the suggestion that Veterans United Realty actually offers buyers a Veterans United agent.  Also contained in the tiny disclaimer above is that "We may share customer information with our trusted affiliates to assist you with your home search."  But in truth, Veterans United Realty will *always* share customer information because Veterans United Realty does not have its own in-house real estate agents. Veterans United, by its own admission, explains that they are a "real estate referral network" and the "real estate agents are not our employees."[10] Veterans United has a broker in each state, but its website explains that they work with "over 5,000 network agents" —strongly indicating that Veterans United Realty does not have real estate agents as employees over a de minimus amount.[11] Veterans United Realty only exists so that Veterans United can receive kickbacks from a fleet of preferred agents.[12]

40.     Defendants have accordingly positioned themselves to capture and steer home buyers regardless of how these buyers began their house search.  If the buyers first sought to get pre-approved through Veterans United Home Loans, then those buyers would be referred to network agents who steered clients back to Veterans United Home Loans.

---

[10] Veterans United Realty, *Better Business Bureau* (2025), https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints.

[11] About Veterans United Realty, *Veterans United Realty*, https://www.veteransunitedrealty.com/about/.

[12] Veterans United Realty, *Better Business Bureau* (2025), https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints (Veterans United explains that their business model simply "refer[s] homebuyers to real estate agents nationwide" showing that the brokerage itself does not offer homebuyers real estate services or provide homebuyers with in-house real estate agents.).

41. If buyers first visited veteransunitedrealty.com, the outcome is the same, although the process is different. In that case, Veterans United Realty (through its parent company, Realty Search Solutions LLC) referred leads to agents in the network, making it clear that these agents were expected to steer leads back to Veterans United Home Loans. These expectations were laid out partly in its "Agent Expectations" document. It begins with the statement that "Veterans United Realty is focused on creating quality relationships between experienced real estate Agents, VA specialized Loan Officers and our clients." The "VA specialized Loan Officers" are plainly Veterans United Home Loan officers; at this point, *the buyer has not selected a loan officer yet*. The "Loan Officer" is assigned to the agent *by Veterans United Realty*. It further advises (or warns) network agents to "Reinforce existing relationships with the client's Loan Officer."

42. Veterans United takes another step to monitor compliance with its steering program by directing agents to use an app called "AgentDash," which is proprietary to the Defendants.[13] AgentDash promotes itself to agents as a means of keeping all information in one place:

# Streamline your real estate transactions

With everything in one place, it's easier than ever to get leads and help clients into homes.

43. By keeping "everything in one place," Defendants can monitor agents' communications, who are told to "leav[e] concise notes on client progress."[14] Agents are also told

---

[13] *See* https://app.myagentdash.com/welcome?postLoginTargetPath=%2Flogin.

[14] *See* https://help.myagentdash.com/en/articles/3902803-our-network-expectations.

to "[w]ork with the loan team to create a game plan on how to best serve the client as a cooperative team." The "cooperative team" here is the agent and the loan officer, along with a "Network Development Coach" assigned to the agent. In fact, agents are required to notify Veterans United Home Loans and their "Network Development Coach" "in the event a client pursues other lending options."[15] The implication is clear: agents are monitored to ensure they are steering clients, and if they are initially unsuccessful, they must immediately inform Veterans United Home Loans. The whole process is designed to always loop back to Veterans United Home Loans.[16]

44. Defendants cannot invoke RESPA's safe harbor provisions for affiliated businesses. The affiliate business arrangement does not apply because the network agents are independent contractors of Veterans United.[17] These agents do not have a formal and direct affiliate business arrangement with Veterans United Home Loans. 12 U.S.C. § 2607(c)(4); 12 U.S.C. § 2602(7). Accordingly, Veterans United gave things of value (referrals to agents) and accepted things of value (kickbacks and agents ensuring that clients used Veteran United Home Loans). This conduct is a clear violation of the § 2607(a) and its implementing regulation.

45. Veterans United provides agents in its referral network with an increased number of leads if they refer clients to Veterans United Home Loans. *See infra* § IV.D. Veterans United

---

[15] *See* https://help.myagentdash.com/en/articles/3902803-our-network-expectations.

[16] As one example, if agents are having difficulties with the AgentDash app, they are advised to email agentupdates@vu.com. "Vu.com" directs the user to Veterans United Home Loans, not Veterans United Realty. And Veterans United Realty's website promotes its connection with Veterans United Home Loans based on the latter's position as the "#1 VA Lender."

[17] As Veterans United Realty explained in response to a complaint about an agent, "the agent is not our employee, and she operates her own business[.]" Veterans United Realty, *Better Business Bureau* (2025), https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints.

specifically tells agents that they need to "reinforce existing relationships with the client's Loan officer," and this loan officer is from Veterans United Home Loans.[18]

46.     As discussed above, referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions."[19] Referrals are not a return on ownership. In fact, payments that differ based on referral rates are impermissible even in affiliate business relationships.[20] An agent's income depends on commissions, and their commissions are directly tied to the amount of leads they get. Veterans United Realty provides its network agents with increased referrals, a thing of value, in exchange for agents referring clients to Veterans United Home Loans, a thing of value. Requiring agents to give referrals to Veteran Home Loans to receive leads is evidence of an illegal steering scheme.

**D.     Testimonials from Current Real Estate Agents and Loan Officers**

47.     Current real estate agents and bank loan officers have offered accounts of their experience with Veterans United Home Loans, all of which are consistent with and corroborate each other.   As presented below, these real estate agents and loan officers have first-hand experience with Defendants' illegal steering and deceptive practices, and the financial impact of these practices on active U.S. military and Veterans.

###     i.     Confidential Real Estate Agent 1

48.     Confidential Real Estate Agent 1 ("CA1") is a real estate broker with decades of experience in the industry.   According to CA1, Veterans United often leads buyers into believing

---

[18] *See* Agent Guidelines, *Veterans United Realty*,
https://www.veteransunitedrealty.com/agent/guidelines/.

[19] 12 C.F.R. § 1024.14(d).

[20] 12 C.F.R. § 1024.15(b)(3)(ii).

that they are dealing "with the VA" or otherwise believing that Veterans United is affiliated with the federal government. According to CA1, Veterans United works with certain third-party agents and sends them pre-qualified buyers. If the agents close on the sale, they pay approximately 35% of the commission back to Veterans United. In addition, these agents are expected to keep the buyer with Veterans United and are strongly discouraged from giving the buyer other mortgage options or seeking competitive bids, thereby completing the exchange of a thing of value between the agents and Veterans United. If agents do not keep these clients with Veterans United, Veterans United will stop sending the agents leads.

49. According to CA1, Veterans United's practices and conduct are a disservice to its clients in the military because Veterans United's loan packages are often more expensive than its competitors. Veterans United also does not provide information to clients about additional options they have to finance the purchase of their home, including first time home buyers' assistance programs.

50. According to CA1, and in CA1's experience, the agents that receive leads from Veterans United tend to be less experienced and knowledgeable. However, clients tend to stick with these agents for the purchase of their homes, because the clients are under the impression that they have no other viable option than to work with these agents or these mortgage providers.

ii. **Confidential Real Estate Agent 2**

51. Confidential Real Estate Agent 2 ("CA2) has been a real estate agent for over six years in the mid-Atlantic region and serves a large portion of the U.S. active duty and veteran community.

52. According to CA2, Veterans United sends leads to specific real estate agents. If these agents close the sale, the agents are required to pay back a portion of their commissions to Veterans United. This payment is not disclosed to the clients. In addition, Veterans United

requires agents to steer clients to Veterans United for loans—and not provide information on other lenders, even though other lenders can offer better rates. If agents do not steer clients to Veterans United, Veterans United cuts off their leads. According to CA2, this is a breach of an agent's fiduciary duty to put the needs of the clients first.

53. According to CA2 and based on CA2's experience, clients who are active military or veterans believe that Veterans United is "the VA." According to CA2, this practice is predatory, because Veterans United is deceiving clients into believing that Veterans United is with the federal government, and taking advantage of these first-time home buyers who believe they are dealing with the VA. In addition, many clients believe that they must work with a "VA agent" to secure the loan. CA2 has lost many clients based on their false belief that they were required to use a "VA agent." According to CA2, this deception is part of the reason why Veterans United is the number one provider of VA-backed loans in the country.

### iii. Confidential Real Estate Agent 3

54. Confidential Real Estate Agent 3 ("CA3") has been in real estate since 2021 in California. CA3's clientele includes many active U.S. military personnel.

55. According to CA3, Veterans United requires agents in its program to use Veterans United Mortgage. If an agent gets a lead from Veterans United and the client is pre-approved through Veterans United, but the client uses another lender, the agent is dropped from the program. According to CA3, agents are not permitted to refer clients to other lenders, even though the closing costs at Veterans United are very high, and the clients could find less costly options elsewhere. This is a particular disservice to active military community, who typically do not have sufficient capital for excessively high closing costs. As a result, the closing costs get wrapped into the loan, which results in a larger loan and larger loan payments.

56.     According to CA3, and based on CA3's experience, active military personnel are loyal to Veterans United because they believe that Veterans United is part of the VA.

### iv.     Confidential Real Estate Agent 4

57.     Confidential Real Estate Agent 4 ("CA4") has been a real estate agent for over 20 years in the mountain West region of the country and has extensive experience working with agents who are part of the Veterans United network.  According to CA4, Veterans United pre-approves buyers and sends these leads to realtors in the Veterans United "network."  These agents then pay a Veterans United real estate company a referral fee of approximately 35%.  According to CA4, this fee is not disclosed to the client.  In addition, according to CA4, the Veterans United real estate companies do not actually engage in real estate sales; they are formed simply to collect the referral fees.

58.     According to CA4, if the agent does not keep the lead with Veterans United Home Loans, the agent will not receive any further leads from Veterans United.  According to CA4, this structure means that the agents do not tell homebuyers that Veterans United's fees or rates are high, because the agents want to keep the leads flowing in the future.

### v.     Confidential Loan Officer 1

59.     Confidential Bank Loan Officer 1 ("CO1") has been a loan officer for over 16 years and currently works in southeastern part of the United States. With several military bases in the area, a substantial portion of CO1's business is with veterans, both active duty and retired.

60.     According to CO1, some real estate agents in CO1's area receive leads from Veterans United, and these agents must pay a portion of their commission back to Veterans United if the deal closes.  These agents are also required to steer their clients back to Veterans United for loans.  If the agents fail to do so, their leads from Veterans United are at risk of being cut off. Based on CO1's experience, agents participating in the referral program refuse to provide their

clients with any alternative lending options other than Veterans United because they do not want to get dropped from the program.

61.     According to CO1, this practice is a significant disservice to veterans and active military because Veteran United's loans are much more costly than available alternatives, including in fees, costs, and higher interest rates. According to CO1, his/her rates currently were up to one half percent lower than what Veterans Untied were offering. Many real estate agents realize that Veterans United has worse loan terms than other competitors but do not offer them another lending option for fear of losing the referral source by Veterans United.

62.     According to CO1, Veterans United gives the impression to its clients that it is "the VA," or at least affiliated with the federal government. Based on that false impression, many clients feel like they should or must use Veterans United for their loans.

### vi.     Confidential Loan Officer 2

63.     According to Confidential Loan Officer 2 ("CO2"), who has served in lending and the real estate industry in the Pacific Northwest for over 30 years, there is a pattern of veterans being drawn in by Veteran United's branding and name recognition, but then the veterans receive incomplete or inaccurate guidance. On multiple occasions, CO2 has seen CO2's clients, who previously tried to use Veterans United, become confused and frustrated based on unclear explanations, inconsistent information, and no meaningful coaching from Veterans United on how to qualify under VA guidelines.

64.     According to CO2, a recurring issue is veterans being told they do not qualify (or cannot qualify) without a clear, guideline-based explanation, or without exploring common VA solutions (including addressing residual income, correct treatment of variable income, correct handling of debts/DTI, credit re-establishment strategies, or documented compensating factors).

In at least three instances within the last six months, CO2 was able to restructure the scenario and move the borrower forward successfully after they were essentially "stopped" by Veterans United.

65.     According to CO2, another consistent complaint from veterans is that the loan was presented as "VA-friendly," but the actual cost structure was inflated or poorly explained. This includes confusion around origination charges, discount points, lender fees vs. third-party fees, and whether the borrower is truly receiving competitive pricing.  According to CO2, Veteran United's financial terms are often materially higher than what is available in the broader market for the same borrower profile.

66.     According to CO2, veterans repeatedly describe working with loan officers who appear inexperienced with VA nuances and who rely on scripted answers rather than problem-solving. Based on CO2's experience, VA lending requires detailed, situation-specific guidance, especially for first-time VA users. According to CO2, when that expertise is missing, veterans are more likely to be misinformed, overcharged, or needlessly turned away and completely frustrated.

**E.     The Harmful and Long-Lasting Economic Impacts of Veterans United's Steering**

67.     Defendants' steering practice can have long-lasting impacts on the housing market. As one article described steering practices, "experts warn this apparent efficiency is masking a system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out competition and discouraging buyers from finding cheaper options."[21] According to this article, it is "part of massive consolidation and restructuring efforts by Zillow and Redfin's corporate owners to corner the trillion-dollar mortgage market, ***which is already driving up housing costs and could heighten the risk of a financial crisis***." *Id.* (emphasis added). Although Zillow and Redfin are mentioned by name in this article, the description of the conduct applies equally to the Defendants.

---

[21] Helen Santoro, "Zillow and Redfin May Be Steering Homebuyers Into Bad Deals," Jacobin (Sept. 16, 2025), https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition.

68.    Defendants' illegal conduct can also have devastating impacts on buyers over the long run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many consumers, shopping around for a home loan can save homebuyers an average of more than $80,000 over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be forced to pay higher fees and interest charges than those who use alternative options." *Id.* Agents steering clients exclusively to Veterans United Home Loans, as opposed to recommending multiple lenders and shopping around, had a negative financial impact on clients. This steering happened in violation of agents' fiduciary duties to their clients.

## V.    CLASS ACTION ALLEGATIONS

69.    Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following Class based on RESPA violations (12 U.S.C. § 2607(a)):

> All persons and entities in the United States who, from January 1, 2020, to the present, used Veterans United Home Loans to finance the purchase of a property.

70.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

71.    The Class is readily ascertainable because records of the relevant property transactions should exist and are easily obtainable.

72.    The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the

Class has at least hundreds of thousands of members, the exact number and their identities being known to Defendants.

73.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

74.     Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

     a.    Whether Defendants engaged in the alleged conduct;

     b.    Whether Defendants' conduct violates RESPA, as alleged herein;

          ii.   Whether Defendants required agents to steer clients to use Veterans United Home Loans;

          iii.   Whether Defendants provided agents with a "thing of value" in exchange for the referrals they provided to agents;

          iv.   Whether Defendants altered the number of referrals sent to agents based on whether agents steered clients to use Veterans United Home Loans;

          v.   Whether Defendants operated an affiliated business arrangement with agents;

          vi.   Whether Defendants provided properly formatted written disclosures of the affiliate relationship (if an affiliate relationship is found to exist);

c.      Whether Veterans United Home Loan's terms and costs were inferior to other third-party options;

d.      Whether Defendants' conduct led to their unjust enrichment;

e.      Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

f.      Whether Defendants' conduct is unlawful; and

g.      The appropriate class-wide measures of damages.

75.     Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class.

76.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

77.     A class action is the superior method for the efficient adjudication of this litigation because individual litigation would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint. Additionally, Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in

inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

78.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b.     The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

    c.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class and Steering Subclass members as a whole.

## VI.     TOLLING THE STATUTES OF LIMITATIONS

79.     As of the date of this Complaint, Defendants do not adequately disclose to potential buyers that they are not part of the VA or otherwise have any connection with the federal government. There was no reasonable way for the public, including Plaintiffs, to know that Defendants are simply a private, for-profit entity, who have no unique connections to the VA. Nor was there a reasonable way for the public to know about the undisclosed fees that preferred agents pay to Defendants.  As a result, any applicable statutes of limitations or response are accordingly tolled.

80.     In addition, Defendants did not disclose to potential buyers that Veterans United preferred agents are required to steer buyers to Veterans United Home Loans.  (Indeed, Defendants conceal the very existence and identity of these preferred agents) There was no reasonable way for the public, including Plaintiffs, to know that Veterans United Home Loans required preferred agents to steer buyers back to Veterans United Home Loans, which offers a substandard product. As a result, Plaintiffs and other members of the public did not discover and reasonably could not have discovered Defendants' RESPA violations and unjust enrichment. Any applicable statutes of limitations or response are accordingly tolled.

### VII.    CLAIMS FOR RELIEF

### COUNT I:

### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. 2607(A) (ON BEHALF OF A NATIONWIDE CLASS)

81.     Plaintiff Peyton brings this claim for himself and on behalf of the Nationwide Class against Defendants. Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

82.     RESPA Section 8(a), 12 U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

83.     A "thing of value" is "broadly defined" under RESPA's implementing regulation by the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

84.     The real estate agents who receive referrals from Veterans United Realty treasure and rely on these referrals, and these agents consider Veterans United referrals as a thing of value. As a result, Veterans United referrals are a thing of value under RESPA.

85.     The home loans originated by Veterans United Home Loans are a "business incident to or a part of a real estate settlement service" pursuant to RESPA Section 9; *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

86.     Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service." 12 C.F.R. § 1024.14(f)(1). Moreover, "an agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern, or course of conduct." 12 C.F.R. § 1024.14(e).

87.     In addition, "when a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

88.     Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: . . . the origination of a federally related mortgage loan."

89.     Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) . . . [or] (3) Provision of any services related to the origination, processing or funding of a federally

related mortgage loan."[22] Veterans United is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

90.     Under these definitions, the mortgage lending services provided by Veterans United Home Loans for federally related loans were "settlement services" under RESPA.

91.     Veterans United Home Loans is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv). Veterans United Home Loans makes or invests in residential real estate loans totaling more than one million dollars per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

92.     The vast majority of mortgages originated by Veterans United Home Loans during the Relevant Time Period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).

93.     The real estate brokers and agents who received referrals from Veterans United Realty made the following referral to Veterans United Home Loans: they steered the Veterans United-referred clients to use Veterans United for financing their home purchase in adherence with Veteran United's referral rules and quotas.

94.     Veterans United Realty therefore gave a "thing of value" to real estate brokers and agents—the ability to continue receiving referrals and obtaining priority for future referrals—under an agreement or understanding that the real estate brokers and agents would refer real estate settlement business involving federally related mortgage loans to Veterans United Home Loans, in violation of RESPA Section 8(a), 12, U.S.C. § 2607(a).

---

[22] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: [] services rendered by a real estate agent or broker").

## COUNT II:

### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A NATIONWIDE CLASS)

95.     Plaintiffs Peyton, Zahn, and Easter bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

96.     The Real Estate Settlement Procedures Act ("RESPA") (codified at 12 U.S.C. § 2601, *et seq.*) was enacted in 1974 to provide consumers with greater and timelier disclosure of the nature and costs of the real estate settlement process and to protect them from abusive practices.

97.     RESPA's premise was that complete disclosure of information would preclude illegal kickbacks, fee splits, unearned fees, and compensated referrals, and thereby empower the consumer to get the same or better services at a lower cost.

98.     Section 7 of RESPA (12 U.S.C. § 2607) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

99.     RESPA confers on the Secretary of the U.S. Department of Housing and Urban Development ("HUD") authority to prescribe rules and regulations to achieve the purposes of RESPA. The regulation adopted by HUD to fulfill its mandate is known as Regulation X, 24 C.F.R. § 3500, *et seq.*

100.     RESPA achieves its goals in a twofold manner: by imposing disclosure requirements in connection with settlement services, and by prohibiting certain practices in connection with settlements.

101.     The term "settlement services" includes any service provided in connection with a real estate settlement, including, but not limited to, providing brokerage services.

102.     HUD has determined in its regulations that kickbacks, fee splits, and referral fees in connection with residential real estate sales are anticompetitive, result in harm to consumers, and thus illegal.

103.     24 C.F.R. § 3500.14 further explains the prohibitions in 12 U.S.C. § 2607 as follows:

> (b)     <u>No referral fees</u>. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

> (c)     <u>No split of charges except for actual services performed</u>. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

> (d)     <u>Thing of value</u>. This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term "payment" is used throughout Secs. 3500.14 and 3500.15 as synonymous with the

giving or receiving any "thing of value'' and does not require
transfer of money.

104.    The Plaintiffs' settlements of residential real estate purchases and sales were
financed in whole or in part by federally related mortgage loans. Plaintiffs Christian Peyton, Salem
Zahn, and Ernest Easter used a lender which is regulated by an agency of the Federal Government.

105.    Defendants are real estate settlement services providers that provided real estate
settlement services involving federally related mortgage loans within the meaning of 12 U.S.C.
§ 2602(2) and § 2607(a) for the settlements at issue.

106.    In the alternative to the preceding allegation, Defendants are subject to RESPA
because, by originating loans, it "provides business incident to or part of" a real estate settlement
service and received settlement fees in connection therewith, within the meaning of 24 C.F.R.
§§ 3500.2 and 3500.14, *et seq.*

107.    In the alternative to the preceding allegation, each Defendant is also a person who
received a split of commissions (other than for services performed) that were paid for the rendering
of a settlement service in transactions involving federally related mortgage loans, within the
meaning of 12 U.S.C. § 2607(a) and (b).

108.    The Veterans United preferred agents who received real estate commissions from
the subject settlements acquiesced in splitting those commissions with the Defendants by paying
the undisclosed 35% fees ("kickbacks") in connection with real estate settlements involving
federally related mortgage loans.

109.    Defendants accepted the kickbacks either as a settlement services provider, a
purported provider of services incident to or part of a real estate settlement service, or a person
within the meaning of 12 U.S.C. § 2607, *et seq.*

110.    Payment and receipt of the kickback violated 12 U.S.C. § 2607(b) in that it
represents a split of commissions paid without rendering any settlement services in connection
with a federally related mortgage loan.

34

111.   Defendants collect the unearned kickbacks from settlement proceeds *only* when a listed property sells.

112.   The kickbacks are paid from settlement proceeds after all real estate settlement services have been rendered. The kickbacks serve no legitimate purpose and are an illegal fee for which Defendants perform no services.

113.   Defendants' unlawful conduct deprived Plaintiffs and Class Members of impartial and independent advice in connection with their real estate transactions, restricted competition among real estate agents and mortgage lenders, and distorted the market for real estate settlement services. As a result, consumers were steered through conflicted referral arrangements and subjected to undisclosed financial incentives that undermined transparency, consumer choice, and inflated the purchase price of homes.

114.   As a direct and proximate result of Defendants' violations of the Real Estate Settlement Procedures Act, Plaintiffs and Class Members were charged, and paid, unlawful and unearned settlement amounts in connection with federally related mortgage loan transactions. Plaintiffs and Class Members were injured by the payment of these unlawful charges and are entitled to all relief available under RESPA.

115.   Each Defendant is jointly and severally liable to Plaintiffs pursuant to 12 U.S.C. § 2607(d)(2) in an amount equal to three times the kickbacks, together with reasonable attorneys' fees, costs, equitable or ancillary relief the Court finds appropriate to prevent ongoing violations, remedy unjust enrichment, and deter similar conduct in the future. 12 U.S.C. § 2607(d).

## COUNT III

## VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010 *ET SEQ.*)

116.   Plaintiffs Peyton, Zahn, and Easter bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

117.     Each Plaintiff and each Defendant are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

118.     Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

119.     The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. "Merchandise" is defined to include "real estate or services." *Id.* § 407.010(4).

120.     The MMPA authorizes class actions, brought on behalf of private causes of action. Mo. Rev. Stat. § 407.025.

121.     Plaintiffs purchased real estate services, loan services, and other services from the Defendants.

122.     As detailed herein, Defendants' conduct was unfair and deceptive.  Among other acts, Defendants deliberately steered clients to use Veterans United Home Loans, despite knowing that it offered loans that were more costly and had higher interest rates.  Defendants also used its name and website to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity.  Defendants further failed to disclose the hidden fees that the preferred agents paid to Veterans United, which a reasonable person would have deemed material.

123.     Defendants' violations of the MMPA were willful and knowing.

124.     Plaintiffs accordingly seek actual damages, declaratory relief, disgorgement of profits from Defendants' unlawful conduct, punitive damages, and attorneys' fees and costs.

**COUNT IV**

**UNJUST ENRICHMENT**
**(ON BEHALF OF A NATIONWIDE CLASS)**

125.    Plaintiffs Peyton, Zahn, and Easter bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

126.    As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of referral fee payments by agents and profits from mortgages to which class members were improperly steered and induced.

127.    In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

128.    As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

129.    The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

130.    Defendants either knew or should have known that referral fee payments by Agents and profits from mortgages that class members were steered towards were obtained improperly. As such, it would be inequitable for Defendants to retain the benefit of the referral fee payments by Agents and profits from mortgages that class members were steered towards.

131.    The financial benefits derived by Defendants from referral fee payments by Agents and profits from mortgages that class members were steered towards rightfully belong to Plaintiffs and Class members.

132.     Defendants' acceptance and retention of the referral fee payments by Agents and profits from mortgages that class members were steered towards under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiffs and Class members. Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.     Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiffs as the representatives of the Class;

B.     Enter joint and several judgments against the Defendants and in favor of Plaintiffs and the Class;

C.     Award the Class damages in an amount to be determined at trial;

D.     Permanently enjoin Defendants' ongoing unlawful conduct;

E.     Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: February 18, 2026          Respectfully submitted,

**BOULWARE LAW LLC**

 /s/ Brandon J.B. Boulware
Brandon J.B. Boulware          MO #54150
Jeremy M. Suhr                MO #60075
Kevin D. Thomson              MO #78346
1600 Genessee, Suite 760
Kansas City, MO 64102
Tele/Fax:        (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
kevin@boulware-law.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman (pro hac vice forthcoming)
Jerrod C. Patterson (pro hac vice forthcoming)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com

***Attorneys for Plaintiffs***