# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | |
|---|---|
| CHRISTIAN PEYTON, SALEM ZAHN, ERNEST EASTER, BRYAN DEWAR, BRANDY JACKSON, DONALD TUMINO, JASON CARSON, JENNIFER MILLER, LILLIAN NORRS, SCOTT BRICKEY, KOBE MOYE, JARED FLORES, DAWN JEFFERSON, JONATHON HOUSER, and DAWN JOHNSON, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>VETERANS UNITED HOME LOANS, REALTY SEARCH SOLUTIONS, LLC, REALTY SEARCH SOLUTIONS NETWORK, LLC (d/b/a VETERANS UNITED REALTY), and MORTGAGE RESEARCH CENTER, LLC, Missouri Corporations,<br><br>          Defendants. | Case No.: 2:26-cv-04039-WJE<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## <u>AMENDED CLASS ACTION COMPLAINT</u>

011364-11/3557875 V1

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ............................................................................................... 1

II. PARTIES .......................................................................................................... 7

A. Plaintiffs ............................................................................................... 7

1.  Plaintiff Christian Peyton.......................................................... 8

2.  Plaintiff Salem Zahn ................................................................. 8

3.  Plaintiff Ernest Easter ............................................................... 9

4.  Plaintiff Bryan Dewar ............................................................... 9

5.  Plaintiff Brandy Jackson .......................................................... 10

6.  Plaintiff Donald Tumino ........................................................... 11

7.  Plaintiff Jason Carson .............................................................. 11

8.  Plaintiff Jennifer Miller............................................................ 12

9.  Plaintiff Lillian Norrs............................................................... 13

10. Plaintiff Scott Brickey.............................................................. 14

11. Plaintiff Kobe Moye ................................................................ 14

12. Plaintiff Jared Flores ............................................................... 15

13. Plaintiff Dawn Jefferson .......................................................... 16

14. Plaintiff Jonathon Houser ........................................................ 16

15. Plaintiff Dawn Johnson............................................................ 17

B. Defendants ........................................................................................... 18

III. JURISDICTION AND VENUE ...................................................................... 20

IV. FACTUAL ALLEGATIONS .......................................................................... 21

A. Real Estate Industry Background......................................................... 21

B. Background on VA-Backed Loans ....................................................... 22

011364-11/3557875 V1

C.    Veterans United's Fraudulent Conduct and Illegal Steering ............................... 23

     1.    Veterans United's Misleading Advertising................................................ 23

     2.    Veterans United's Illegal Steering............................................................ 40

D.    Testimonials from Current Real Estate Agents and Loan Officers ...................... 48

     1.    Confidential Real Estate Agent 1.............................................................. 49

     2.    Confidential Real Estate Agent 2.............................................................. 50

     3.    Confidential Real Estate Agent 3.............................................................. 50

     4.    Confidential Real Estate Agent 4.............................................................. 51

     5.    Confidential Real Estate Agent 5.............................................................. 52

     6.    Confidential Loan Officer 1....................................................................... 53

     7.    Confidential Loan Officer 2....................................................................... 54

     8.    Confidential Loan Officer 3....................................................................... 55

     9.    Confidential Loan Officer 4....................................................................... 57

     10.   Confidential Loan Officer 5....................................................................... 58

     11.   Confidential Loan Officer 6....................................................................... 59

     12.   Confidential Loan Officer 7....................................................................... 59

     13.   Confidential Loan Officer 8....................................................................... 62

E.    Publicly Available Statements Corroborating Plaintiffs'
     Allegations ............................................................................................................. 63

F.    RESPA's Safe Harbor Does Not Apply................................................................ 68

G.    The Harmful and Long-Lasting Economic Impacts of Veterans
     United's Steering ................................................................................................... 70

V.     CLASS ACTION ALLEGATIONS ............................................................................... 71

VI.    TOLLING THE STATUTES OF LIMITATIONS.......................................................... 74

VII.   CLAIMS FOR RELIEF .................................................................................................. 75

011364-11/3557875 V1

COUNT I: VIOLATION OF THE REAL ESTATE SETTLEMENT
PROCEDURES ACT, 12 U.S.C. § 2607(A) (ON BEHALF OF A
NATIONWIDE CLASS) .......................................................................................... 75

COUNT II: VIOLATION OF THE REAL ESTATE SETTLEMENT
PROCEDURES ACT, 12 U.S.C. § 2607(B) (ON BEHALF OF A
NATIONWIDE CLASS) .......................................................................................... 78

COUNT III: VIOLATIONS OF THE MISSOURI MERCHANDISING
PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*) (ON
BEHALF OF A NATIONWIDE CLASS, OR ALTERNATIVELY ON
BEHALF OF A MISSOURI CLASS) ................................................................. 83

COUNT IV: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.*
AND 720 ILCS 295/1A) (ON BEHALF OF AN ILLINOIS CLASS).............................. 86

COUNT V: VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW
§ 349 (N.Y. GEN. BUS. LAW § 349)) (ON BEHALF OF A NEW YORK
CLASS).............................................................................................................. 88

COUNT VI: VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES
ACT (OHIO REV. CODE § 1345.01 *ET SEQ.*) (ON BEHALF OF AN
OHIO CLASS).................................................................................................... 91

COUNT VII: VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
PRACTICES-CONSUMER PROTECTION ACT ("DTPA") (TEX. BUS.
& COM. CODE §§ 17.41, *ET SEQ.*) (ON BEHALF OF A TEXAS
CLASS)................................................................................................................ 94

COUNT VIII: UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE
CLASS)................................................................................................................ 96

REQUEST FOR RELIEF ................................................................................................... 98

DEMAND FOR JURY TRIAL ........................................................................................ 98

Case 2:26-cv-04039-WJE     Document 32     Filed 05/04/26     Page 4 of 104
011364-11/3557875 V1

Plaintiffs Christian Peyton, Salem Zahn, Ernest Easter, Bryan Dewar, Brandy Jackson, Donald Tumino, Jason Carson, Jennifer Miller, Lillian Norrs, Scott Brickey, Kobe Moye, Jared Flores, Dawn Jefferson, Jonathon Houser, and Dawn Johnson bring this action on behalf of themselves and on behalf of the proposed Class, defined below, and allege upon information and belief and the investigation of counsel as follows:

## I. INTRODUCTION

1. The U.S. Department of Veterans Affairs ("VA") runs an essential program for Veterans and active U.S. military looking to buy a house: the VA serves as guarantor for part of the mortgage, which makes it easier for borrowers to purchase a home. Veterans and active U.S. military have accordingly grown to trust and rely on VA home loans as an essential part of becoming a homeowner.

2. Veterans United Home Loans and the remaining Defendants (Realty Search Solutions, Realty Search Solutions Network, and Mortgage Research Center) have capitalized on and exploited the housing needs of military service members and Veterans for VA home loans by falsely presenting itself as part of the VA. It is not: Veterans United is a private for-profit corporation that has no affiliation with the VA whatsoever, founded and run by three individuals with no military service. But its websites are intentionally designed to mislead home buyers into believing that it is part of the VA. For instance, Veterans United Home Loans promotes itself as "The Nation's #1 VA Lender":

011364-11/3557875 V1



3.     As detailed below, multiple real estate and loan officers have confirmed the deceptive nature of this advertising: they routinely lose business to Veterans United because customers—Veterans and active U.S. military—believe that they need to use Veterans United because it is "part of" the VA.

4.     The deception does not end at Veterans United Home Loan's website. Veterans United has a network of real estate agents (the "Network Agents") throughout the country who do not work for Veterans United, but who receive referrals (or "leads") from Veterans United Realty. If the agent who receives a lead closes on a house, these Network Agents pay Veterans United Realty a substantial proportion (around 35%) of their commission. These agents are also *required* to steer their clients to use Veterans United Home Loans for their home loans. If the agents do not steer clients to Veterans United Home Loans, they stop receiving leads.

5.     The harm from this deception is compounded by the fact that Veterans United loans are more costly and have higher interest rates compared to what home buyers could obtain with other lenders. Veterans United also offers less financial aid packages compared to its competitors.

6.     Since the initial Complaint was filed, multiple real estate agents and loan officers have come forward to corroborate and confirm the veracity of the Complaint's allegations, and

011364-11/3557875 V1

have provided additional, disturbing allegations of Veterans United's misconduct. In particular, mortgage professionals have disclosed that Veterans United Home Loans has a deliberate "bait and switch" policy to lure in clients with enticing terms, only to change the terms as the transaction advances. During the "shopping" phase, Veterans United Home Loans provisionally offers homebuyers lower interest rates, when the interest rate is not fixed. During the next phase, Veterans United Home Loans provides a "fixed rate" with a higher interest rate or higher costs. At that point, Veterans and service members either feel like they have no choice but to go forward with the transaction because they believe they are dealing with "the VA," or because they have already paid money that they will forfeit if they lose the house.

7. These allegations are supported by specific examples and documents. As detailed below, a confidential loan officer provided redacted copies of two Loan Estimates from Veterans United, reflecting a "floating" rate and a "fixed" rate. The interest rate on this loan increased by .25% in just three days between the floating and fixed proposals. But the mortgage market *demonstrably improved* during this three-day period, by about .25%. Veterans United's practice of blaming "market conditions" for an increase in rates is demonstrably false.

8. The clear picture that emerges from these allegations is that Veterans United has succeeded based on its brilliant yet cynical advertising and marketing campaign through Defendant Realty Search Solutions, LLC, even as it fails to serve Veterans and U.S. miliary, saddling them with more debt for the life of their loan. Collectively, these agents and officers have confirmed the following:

- Veterans United Home Loans is a predatory lender that routinely charges Veterans thousands of dollars more for loans. Veterans United charges higher interest rates, and much higher fees and costs, which makes Veterans United a tremendous amount of profit. Veterans United is essentially a marketing company, spending millions of dollars marketing itself as a VA company, even as it employs untrained

and unprofessional loan officers, which leads to unnecessary delays and higher costs. *See infra* ¶ 113.

- Veterans United's steering practices are a disservice to its clients in the military because Veteran United's loan packages are more expensive than its competitors. Veterans United also does not provide information to its clients about additional options they have to finance the purchase of their homes, including first time home buyer assistance programs. ¶ 81.

- Veterans United sometimes misleadingly tells Veterans and service members that they do not qualify for a VA loan, because their credit scores are too low. This is wrong; there is no minimum credit score to qualify for a VA loan. Veterans United chooses not to take the risk of loaning to borrowers with lower credit, so it falsely tells borrowers that they do not qualify. ¶ 107.

- Veterans United states or suggests to clients that they have no choice but to use Veterans United's "Network Agents." Although Veterans United often promises clients that they will receive a reduction in costs if the clients use the Network Agents, the costs are already astronomical, such that a reduction in costs is illusory and the Veterans United loans are still more expensive than competitors' rates and costs. ¶ 93.

- Clients who are active military or Veterans believe that Veterans United is "the VA." This is a predatory practice, because Veterans United is deceiving clients into believing that Veterans United is part of the federal government, and taking advantage of home buyers who believe they must work with a "VA agent" to secure the loan. To further this false narrative that Veterans United is "part of" the VA, Veterans United promotes a panel of "military advisers" on its website. ¶¶ 103, 105.

- Veterans United's steering practices increase costs for active military customers, which is a particular disservice to this community, who typically do not have sufficient capital to cover these costs. Veterans United's excessive closing costs get wrapped into the loan, which results in a larger loan and larger loan payments. ¶ 87.

- Veterans United Realty is formed to collect the 35% the Network Agents pay Veterans United. Veterans United Realty has few, if any, practicing real estate agents on staff outside of Missouri who buy and sell houses. Rather, it operates a referral network to collect fees from a vast network of agents that are not employed by Veterans United Realty. ¶ 89.

- Veterans United Network Agents do not provide their clients with alternate lending options other than Veterans United because, if they did, they would be dropped from the program. As one example, a loan officer's home state offers a 2% grant to subsidize home purchases using a VA loan, which reduces out-of-pocket costs for military families at closing. Veterans United does not participate in this program. ¶ 117.

011364-11/3557875 V1

9. Defendants' conduct as alleged herein violates federal statutes that seek to promote transparency and accountability in the real estate industry, in at least two respects. *See* Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607. ***First***, Veterans United Realty's practice of providing leads to agents in exchange for pushing clients to Veterans United Home Loans is blatant steering not permitted by RESPA. Veterans United and participating agents reciprocally give and receive a "thing of value," in violation of RESPA. *See* 12 U.S.C. § 2607(a). Referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions." 12 C.F.R. § 1024.14(d). Veterans United and the agent network are engaged in a perpetual loop of illegal referrals and kickbacks, as illustrated below:



10. ***Second***, by requiring Network Agents to pay the undisclosed 35% fee, Defendants are further violating RESPA because Defendants are receiving a payment that is not in exchange for completing the property transaction; it is simply a payment that the Network Agents have to pay Veterans United Realty to avoid being dropped from the network. RESPA prohibits receiving payments that are not "in connection with a transaction involving a federally related mortgage loan." 12 U.S.C. 2607(b). Indeed, Defendants admit that "We operate a referral network, and such

011364-11/3557875 V1

were not a party to [a property] transaction."[1] The 35% payments are not in connection with the closing of the property sale, and Plaintiffs are entitled to treble damages under the statute. *See* 12 U.S.C. § 2607(d)(2).

11. Defendants' conduct also constitutes a violation of state consumer protection laws. Missouri's consumer protection law, for example, prohibits "any deception … [or] unfair practice, or the concealment … of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. "Merchandise" is defined by statute to include "real estate or services." *Id.* § 407.020.4. Defendants designed their websites to trick potential home buyers into believing that they were working with "the VA," or at least with someone affiliated with the VA or the federal government. Defendants also unfairly and deceptively did not disclose to the home buyers that Veterans United is receiving approximately 35% of the Network Agents' commission at the end of the transaction—facts that the buyers need to, and should, know as they negotiate the sale of the property. This 35% unlawful kickback inflates the commissions paid and, as a result, the amount of the mortgage. Defendants are headquartered in Missouri, and these deceptive acts and marketing techniques originate from Missouri.[2]

12. Defendants have also unjustly enriched themselves through their conduct. They are primarily a marketing and call center company, who quickly sell the loans to continue their "churn and burn" practices. They have engaged in patently unfair and deceptive behavior and obtained a

---

[1] https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints (last visited May 4, 2026).

[2] In the alternative, Plaintiffs also allege violations of the consumer protection laws of several states (Illinois, New York, Ohio, and Texas) on behalf of Plaintiffs who reside in those states.

011364-11/3557875 V1

windfall of ill-gotten gains as a result. Defendants are liable to Plaintiffs and the Class for all profits earned from their deceitful conduct.

13. Plaintiffs, on behalf of themselves and all persons in the United States who, since January 1, 2018, purchased a home financed by Veterans United Home Loans, bring this action for Defendants' violations of RESPA, state consumer protection laws, and common law unjust enrichment. Plaintiffs seek treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II. PARTIES

### A. Plaintiffs

14. For ease of reference, listed below are the Class Representatives:

| Plaintiff Name | State | RESPA § 2607(A) Violation | RESPA § 2607(B) Violation |
|---|---|---|---|
| Christian Peyton | TN | ✓ | ✓ |
| Salem Zahn | TX | | ✓ |
| Ernest Easter | PA | | |
| Bryan Dewar | CO | ✓ | ✓ |
| Brandy Jackson | PA | ✓ | ✓ |
| Donald Tumino | OH | ✓ | ✓ |
| Jason Carson | KS | ✓ | ✓ |
| Jennifer Miller | IL | ✓ | ✓ |
| Lillian Norrs | NY | ✓ | ✓ |
| Scott Brickley | MO | ✓ | ✓ |
| Kobe Moye | IL | ✓ | ✓ |
| Jared Flores | TX | ✓ | ✓ |
| Dawn Jefferson | FL | ✓ | ✓ |
| Jonathon Houser | OH | ✓ | ✓ |
| Dawn Johnson | VA | ✓ | ✓ |

011364-11/3557875 V1

### 1. Plaintiff Christian Peyton

15. Plaintiff Christian Peyton is a Veteran and resident of Gallatin, Tennessee. Plaintiff Peyton served in the U.S. Army Reserve and U.S. Army National Guard for several years, with an honorable discharge in 2007. Plaintiff Peyton currently receives 100% permanent and total disability benefits from the VA. On May 17, 2022, Plaintiff Peyton used Veterans United Home Loans to purchase a property in Gallatin. Plaintiff Peyton initially used Veterans United Home Loans to get pre-approval, and then Veterans United Home Loans referred him to a Veterans United associated real estate agent (B.D.) to purchase the property. Plaintiff Peyton's loan officer, N.K., worked at Veterans United Home Loan's office in Columbia, Missouri. B.D. did not tell Plaintiff Peyton that the agent had to pay a substantial portion of his/her commission back to Veterans United Realty, or that the agent was required to steer Plaintiff to close with Veterans United Home Loans. Plaintiff Peyton believed that Veterans United was part of the VA, because Veterans United advertised itself as the "Top VA Leader," and the emails and signature blocks emphasize its Veterans affiliation and the veteran status of the loan officer. As detailed herein, Network Agents like B.D. paid 35% of their commissions to Veterans United Realty and steered Plaintiff Peyton to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Peyton's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 2. Plaintiff Salem Zahn

16. Plaintiff Salem Zahn is a Veteran and a resident of Bedford, Texas. Plaintiff Zahn served in the U.S. Marine Corps for four years as a Logistics Man and was honorably discharged with the rank of Corporal. On August 15, 2025, Plaintiff Zahn used Veterans United Home Loans to purchase a property in Bedford, using real estate agent J.C. Plaintiff Zahn's loan officer, Z.R., worked at Veterans United Home Loan's office in Columbia, Missouri. J.C. did not tell Plaintiff

011364-11/3557875 V1

Zahn that J.C. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that J.C. was required to steer Plaintiff Zahn to close with Veterans United Home Loans. Plaintiff Zahn used Veterans United Home Loans because she assumed, based on the name, that it would prioritize her interests and look out for her. However, Plaintiff Zahn has had substantial electrical problems at her home and believes that the Veterans United Home Loans appraiser did not adequately appraise her property. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Zahn to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Zahn's mortgage, who accordingly overpaid for her settlement services because of Defendants' abusive and unfair practices.

### 3. Plaintiff Ernest Easter

17. Plaintiff Ernest Easter is a Veteran and a resident of Lansdale, Pennsylvania. Plaintiff Easter served in the U.S. Army for seven years, including as the Chief Signal Specialist, and was responsible for information network security. He received an honorable discharge. On September 30, 2022, Plaintiff Easter used Veterans United Home Loans to purchase a property in Landsdale. Loan officer B.A., who oversaw Plaintiff Easter's loan, worked at Veterans United's office in Columbia, Missouri. Plaintiff Easter used Veterans United Home Loans because he assumed it was part of the VA. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Easter to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Easter's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 4. Plaintiff Bryan Dewar

18. Plaintiff Bryan Dewar is a Veteran and a resident of New Castle, Colorado. Plaintiff Dewar served in the Marine Corps for four years as an Amphibious Assault Vehicle Crewman and

011364-11/3557875 V1

received an honorable discharge. On November 18, 2020, Plaintiff Dewar used Veterans United Home Loans to purchase a property in New Castle, using real estate agent C.F. C.F. did not tell Plaintiff Dewar that C.F. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that C.F. was required to steer Plaintiff Dewar to close with Veterans United Home Loans. C.F. pushed Plaintiff Dewar to use Veterans United Home Loans and made it seem like Veterans United Home Loans was his only viable option. Plaintiff Dewar used Veterans United Home Loans because he assumed, based on the name and website, that Veterans United was affiliated with the U.S. Department of Veterans Affairs and would prioritize his interests. However, as detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Dewar to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Peyton's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 5. Plaintiff Brandy Jackson

19. Plaintiff Brandy Jackson is a Veteran and a resident of Newcastle, Pennsylvania. Plaintiff Jackson served in the Army Reserve for 17 years as a Supply Sergeant. On September 28, 2018, Plaintiff Jackson used Veterans United Home Loans to purchase a property in Newcastle, using real estate agent J.A. J.A. did not tell Plaintiff Jackson that J.A. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that J.A. was required to steer Plaintiff Jackson to close with Veterans United Home Loans. J.A. pushed Plaintiff Jackson to use Veterans United Home Loans and made it seem like Veterans United Home Loans was her only viable option. Plaintiff Jackson's loan officer was B.F., who worked in Veterans United's office in Columbia, Missouri. Plaintiff Jackson used Veterans United Home Loans because she assumed, based on the name and website, that it was affiliated with the U.S. Department of Veterans Affairs and would prioritize her interests. However, as detailed herein, Network Agents

011364-11/3557875 V1

paid 35% of their commissions to Veterans United Realty and steered Plaintiff Jackson to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Jackson's mortgage, who accordingly overpaid for her settlement services because of Defendants' abusive and unfair practices.

### 6. Plaintiff Donald Tumino

20. Plaintiff Donald Tumino is a Veteran and a resident of Cleveland, Ohio. Plaintiff Tumino served in the Navy for four years as a machine reparist. He received an honorable discharge. On October 18, 2025 2025, Plaintiff Tumino used Veterans United Home Loans to purchase a property in Cleveland, using real estate agent B.W. Plaintiff Tumino's loan officer, J.B., worked at Veterans United Home Loan's office in Columbia, Missouri. B.W. did not tell Plaintiff Tumino that B.W. had to pay a substantial portion of the agent's commission back to Veterans United, or that B.W. was required to steer Plaintiff Tumino to close with Veterans United Home Loans. B.W. encouraged Plaintiff Tumino to use Veterans United Home Loans. Plaintiff Tumino used Veterans United Home Loans because he assumed, based on the name, that it would look out for his interests. However, Plaintiff Tumino believes Veterans United increased his closing costs and charged him a higher interest rate on his loan. As detailed herein, Network Agents paid 35% of their commissions to Veterans United and steered Plaintiff Tumino to Veterans United. These unlawful actions unnecessarily increased the cost of Plaintiff Tumino's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 7. Plaintiff Jason Carson

21. Plaintiff Jason Carson is a Veteran and a resident of Wichita, Kansas. Plaintiff Carson served in the Air Force for eight years as an aerial gunner and in heavy avionics. He received an honorable discharge. On December 19, 2022, Plaintiff Carson used Veterans United

Home Loans to purchase a property in Wichita, using real estate agent B.B. B.B. did not tell Plaintiff Carson that B.B. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that B.B. was required to steer Plaintiff Carson to close with Veterans United Home Loans. B.B. encouraged Plaintiff Carson to use Veterans United Home Loans and told Plaintiff Carson that the homebuying process would be streamlined if he used Veterans United. Plaintiff Carson used Veterans United Home Loans because he assumed, based on the name and website, that it was endorsed by the VA. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Carson to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Carson's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 8. Plaintiff Jennifer Miller

22. Plaintiff Jennifer Miller is a Veteran and a resident of Dixon, Illinois. Plaintiff Miller served in the United States Marine Corps for two years as an Embarkation/Logistics Specialist. She received an honorable discharge. On March 7, 2025, Plaintiff Miller used Veterans United Home Loans to purchase a property in Dixon, using real estate agent C.B. Plaintiff Miller interacted with a loan officer, S.G., who works at Veterans United Home Loan's office in Columbia, Missouri. C.B. did not tell Plaintiff Miller that C.B. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that C.B. was required to steer Plaintiff Miller to close with Veterans United Home Loans. C.B. encouraged Plaintiff Miller to use Veterans United Home Loans and told Plaintiff Miller that Veterans United would offer her better deals in comparison to other mortgage companies. C.B. also told Plaintiff Miller that Veterans United Home Loans was a good mortgage company to use. C.B. told Plaintiff Miller not to use Rocket Mortgage after Plaintiff Miller saw ads for the company. Plaintiff Miller used Veterans

United Home Loans because she assumed, based on the name, website, and flyers mailed to her, that it was related to the VA and would offer veterans the best deals possible. Veterans United increased Plaintiff Miller's closing costs, and Plaintiff Miller eventually refinanced to work with a better mortgage company. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Miller to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Miller's mortgage, who accordingly overpaid for her settlement services because of Defendants' abusive and unfair practices.

9. **Plaintiff Lillian Norrs**

23. Plaintiff Lillian Norrs is a resident of Herkimer, New York. Plaintiff Norrs's husband is currently serving in the Army and has served in the Army for eight years. On March 29, 2025, Plaintiff Norrs used Veterans United Home Loans to purchase a property in Herkimer, using real estate agent B.C. Plaintiff Norrs's loan officer, S.W., worked at Veterans United Home Loan's office in Columbia, Missouri. B.C. did not tell Plaintiff Norrs that B.C. had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that B.C. was required to steer Plaintiff Norrs to close with Veterans United Home Loans. B.C. pushed Plaintiff Norrs to use Veterans United Home Loans and said they were good mortgage company for veterans. Plaintiff Norrs used Veterans United Home Loans because employees at Veterans United told her it was a VA company. Plaintiff Norrs assumed, based on the name, website, and statements from Veterans United employees, that it was related to the VA. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Norrs to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Norrs's mortgage, who accordingly overpaid for her settlement services because of Defendants' abusive and unfair practices.

011364-11/3557875 V1

### 10. Plaintiff Scott Brickey

24. Plaintiff Scott Brickey is a Veteran and a resident of Hawk Point, Missouri. Plaintiff Brickey served in the Army for three years as a 91lb Light Wheeled Mechanic. He received an honorable discharge. On August 19, 2019, Plaintiff Brickey used Veterans United Home Loans to purchase a property in Missouri, using real estate agent M.M. M.M. did not tell Plaintiff Brickey that she had to pay a substantial portion of the agent's commission back to Veterans United, or that she was required to steer Plaintiff Brickey to close with Veterans United Home Loans. M.M. encouraged Plaintiff Brickey to use Veterans United Home Loans. The real estate agent told Plaintiff Brickey that Veterans United was his best option and that he should stick with using Veterans United Home Loans. Plaintiff Brickey used Veterans United Home Loans because he assumed, based on the name and website, that it would look out for his interests. Veterans United suddenly increased Plaintiff Brickey's interest rate at closing. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Brickey to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Brickey's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

### 11. Plaintiff Kobe Moye

25. Plaintiff Kobe Moye is a Veteran and a resident of Gibson City, Illinois. Plaintiff Moye served in the United States Marine Corps for 4 years as a Mortarman. He received an honorable discharge. On June 13, 2023, Plaintiff Moye used Veterans United Home Loans to purchase a property in Gibson City, using real estate agent A.P. A.P. did not tell Plaintiff Moye that A.P. was required to steer Plaintiff Moye to close with Veterans United Home Loans. A.P. encouraged Plaintiff Moye to use Veterans United Home Loans, and A.P. told Plaintiff Moye not to shop around for other mortgages. Plaintiff Moye used Veterans United Home Loans because he

011364-11/3557875 V1

assumed, based on the name, that it was endorsed by the VA and would look out for his interests. However, Plaintiff Moye believes the Veterans United Home Loans appraiser did not adequately appraise his property. Plaintiff Moye is planning to initiate a short sale on his home to avoid additional losses. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Moye to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Moye's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

**12. Plaintiff Jared Flores**

26. Plaintiff Jared Flores is a Veteran and a resident of Mesquite, Texas. Plaintiff Flores served in the U.S. Army from 2019-2025 as a lead turbine engine repair man. He received an honorable discharge. On February 25. 2025, Plaintiff Flores used Veterans United Home Loans to purchase a property in Texas, using real estate agent C.C. The real estate agent did not tell Plaintiff Flores that they had to pay a substantial portion of the agent's commission back to Veterans United Realty, or that they were required to steer Plaintiff Brickey to close with Veterans United Home Loans. The real estate agent encouraged Plaintiff Flores to use Veterans United Home Loans. The real estate agent told Plaintiff Flores that using Veterans United Home Loans would streamline the process and make paperwork easier. The real estate agent did not inform Plaintiff Flores about other mortgage options. Plaintiff Flores used Veterans United Home Loans because he assumed, based on the name, website, and other communications, that it was affiliated with the VA. Plaintiff Flores believes his interest rate is high. Plaintiff Flores believes he was being overcharged on his loans before he refinanced. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Flores to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Flores's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

011364-11/3557875 V1

### 13. Plaintiff Dawn Jefferson

27.  Plaintiff Dawn Jefferson is a resident of Orlando, Florida. Her husband is a retired Veteran who served in the United States Army for 12 years. On October 28, 2021, Plaintiff Jefferson and her husband purchased their home through real estate agent K. B., with the mortgage approved through Veterans United Home Loans. K. B. encouraged them to use Veterans United Home Loans, stating it was a certified company that supports veterans and would offer the best interest rates. Plaintiff Jefferson was never presented with other options. Plaintiff Jefferson used Veterans United Home Loans believing it was certified to process VA Loans and adhered to Veterans Administration requirements based on its name, website, and other communications. Plaintiff Jefferson's loan officer, K.M., worked at Veterans United Home Loan's office in Missouri.

28.  The home appraisal was conducted by a certified appraiser selected by Veterans United. Plaintiff Jefferson believes the appraisal was inadequate, and the loan should not have been approved under VA guidelines. Damages that were visible during the appraisal—including holes in walls, faulty wiring, and bursting pipes—led to extreme water damage. Veterans United has refused to approve their lender-placed insurance for repairs, resulting in further damage to the home. Plaintiff Jefferson's husband filed for bankruptcy because of the damage to the home. Plaintiff Jefferson believes Veterans United engaged in unfair business practices and violated RESPA. The loan is currently serviced by Rocket Mortgage; Plaintiff Jefferson was not notified of mortgage changes by Veterans United Home Loans. As a result of Defendants' unfair business practices, Plaintiff Jefferson and her husband overpaid for their mortgage loan.

### 14. Plaintiff Jonathon Houser

29.  Plaintiff Jonathon Houser is a Veteran and a resident of Kent, Ohio. Plaintiff Houser served in the Army National Guard and Army Reserve for nine years as a 88m truck driver heavy

011364-11/3557875 V1

equipment operator. He received an honorable discharge. On June 5, 2019, Plaintiff Houser used Veterans United Home Loans to purchase a property in Ohio, using real estate agent J.K. Plaintiff Houser's loan officer, T.C., worked at Veterans United Home Loan's office in Columbia, Missouri. J.K. did not tell Plaintiff Houser that she was required to steer Plaintiff Houser to close with Veterans United Home Loans or that she had to pay a substantial portion of her commissions back to Veterans United. The real estate agent encouraged Plaintiff Houser to use Veterans United Home Loans and told Plaintiff Houser that they were a good company.

30. Plaintiff Houser used Veterans United Home Loans because he assumed, based on the name and other communications, that it would look out for his interests as a veteran. However, Plaintiff Houser believes that Veterans United Home Loans inspector and appraiser did not adequately assess the property. The home had significant issues, including electrical issues that presented a fire hazard. Additionally, the basement has flooding issues, and the roof needs repairs. As a result of these issues, Plaintiff Houser sent a demand letter to the sellers and is now paying a roof repair loan. Plaintiff Houser believes the loan should not have gone through because of the issues with the house. Plaintiff Houser also believes that his interest rate is high. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Houser to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Houser's mortgage, who accordingly overpaid for his settlement services because of Defendants' abusive and unfair practices.

**15. Plaintiff Dawn Johnson**

31. Plaintiff Dawn Johnson is a Veteran and a resident of Woodbridge, Virginia. Plaintiff Johnson served in the Army for four years, from 1997 to 2001. She received an honorable discharge. On April 17, 2026, Plaintiff Johnson used Veterans United Home Loans to purchase a property in Virginia, using real estate agent N.A. Plaintiff Johnson's loan officer, B.L., worked at

Veterans United Home Loan's office in Earth City, Missouri. N.A. did not tell Plaintiff Johnson that she had to pay a substantial portion of the agent's commission back to Veterans United, or that N.A. was required to steer Plaintiff Johnson to close with Veterans United Home Loans. N.A. pushed Plaintiff Johnson to use Veterans United Home Loans. N.A. implied that Veterans United Home Loans was Plaintiff Johnson's only option. Plaintiff Johnson used Veterans United Home Loans because she assumed, based on the name, website, and other communications, that it would look out for her interests as a Veteran. Plaintiff Johnson believes her interest rate is high. She believes that she should have received a lower interest rate because her credit score is above 800. Veterans United also pushed Plaintiff Johnson to use N.A., despite N.A. pressuring Plaintiff Johnson to not conduct a second inspection, because Veterans United had worked with N.A. for years. As detailed herein, Network Agents paid 35% of their commissions to Veterans United Realty and steered Plaintiff Johnson to Veterans United Home Loans. These unlawful actions unnecessarily increased the cost of Plaintiff Johnson's mortgage, who accordingly overpaid for her settlement services because of Defendants' abusive and unfair practices.

**B.      Defendants[3]**

32.      Defendant Veterans United Home Loans is registered as a "Fictitious Name" with the Missouri Secretary of State, with its principal place of business at 1400 Forum Blvd., Suite 18, Columbia, Missouri. Veterans United Home Loans is 100% owned by Mortgage Research Center, LLC.

---

[3] In their motion to dismiss (Dkt. No. 23), Defendants argue Plaintiffs improperly engage in "group pleading." Plaintiffs distinguish among the Veterans United entities where appropriate, but Defendants themselves purposefully blur the distinctions among the entities, seemingly to create confusion about which entities are accountable for Defendants' conduct.

011364-11/3557875 V1

33. Defendant Mortgage Research Center, LLC is a Missouri corporation with its principal place of business at 1400 Forum Blvd., Suite 18, Columbia, Missouri. Its registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101. On November 19, 2002, it was originally incorporated as Pinnacle Financial Consultants, LLC, with Brock Bukowsky and Brant Bukowsky as the founding members. It changed its name to Mortgage Research Center, LLC on June 7, 2004. Brant Bukowsky is identified on his LinkedIn profile as the "Co-Founder" of Veterans United Home Loans. Based on his LinkedIn profile, he has not served in the military.[4] Brock Bukowsky is identified on his LinkedIn profile as the "Co-Owner" of Veterans United Home Loans. Based on his LinkedIn profile, he has not served in the military.[5] Nathan Long is identified as the CEO of Veterans United Home Loans on his LinkedIn profile; based on his profile, he has not served in the military.[6]

34. Defendant Realty Search Solutions, LLC is a subsidiary of Veterans United Realty and acts as its marketing arm. It has its principal place of business at 1512 Heriford Road, Columbia, Missouri. Its registered agent is CSC-Lawyers Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101.

35. Defendant Realty Search Solutions Network, LLC has its principal place of business at 1512 Heriford Road, Columbia, Missouri. Its registered agent is CSC-Lawyers

---

[4] https://www.linkedin.com/in/brantbukowsky/ (last visited May 4, 2026).

[5] https://www.linkedin.com/in/brockbukowsky/ (last visited May 4, 2026).

[6] https://www.linkedin.com/in/nathan-long-b07a446/ (last visited May 4, 2026). *See also* https://www.facebook.com/groups/ClubWealth/posts/2860838370768662/ (last visited May 4, 2026) ("Did you know that veterans united isn't even owned or was created by a veteran lmao. Just a couple [guys] that decided to create a company tgat [sic] leads people to believe its owned and operated by a veteran. Just a fun fact.); *id.* ("definitely a predatory lender. Too many Veterans think they are a direct connect to VA!").

011364-11/3557875 V1

Incorporating Service Company, 221 Bolivar Street, Jefferson City, Missouri 65101. It is doing business as Veterans United Realty.

### III. JURISDICTION AND VENUE

36. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises from violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.S. § 2601, *et seq.* The Court has subject matter jurisdiction over the unjust enrichment and state consumer protection claims under 28 U.S.C. § 1367 as these claims are so related to the violations of RESPA that it forms part of the same case or controversy.

37. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

38. This Court has personal jurisdiction over each of the Defendants because these Defendants have (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) their principal place of business in this District; (4) had substantial contacts with the United States, including in this District; and (5) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

39. Venue is proper in this District because each Defendant transacts substantial business in this District, as alleged throughout this Complaint. These Defendants reside in this District or transact business in this District. These Defendants also market and sell products and services in this District (partly through Defendant Realty Search Solutions, LLC), have had continuous and systematic contacts with this District, and engaged in illegal steering conduct that

011364-11/3557875 V1

were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV. FACTUAL ALLEGATIONS

### A. Real Estate Industry Background

40. State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

41. Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. As a result, a real estate brokerage's contracts with sellers and buyers are required to be with its brokers, not agents, and all payments to individual realtors or agents pass through the brokers.

42. In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells. An increase in the commission leads to a higher purchase price of the home and a higher mortgage.

43. Real estate agents are state-licensed professionals who are obligated by law and professional ethics to act in their clients' best interests. Licensed agents must complete required education, pass state examinations, and comply with state licensing laws that recognize their fiduciary duties of loyalty and full disclosure to their clients. Agents may work independently or under the supervision of licensed brokers, but in all cases, their professional role is to advise clients impartially and to avoid conflicts of interest. As a result, real estate agents owe fiduciary duties of loyalty, care, and full disclosure to the clients they represent. These duties require agents to act

011364-11/3557875 V1

solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice.

**B.      Background on VA-Backed Loans**

44.     The VA Home Loans program is designed to support Veterans and service members in buying their home. The VA acts as a guarantor for a portion of the borrower's loan, thereby allowing the borrower to qualify for loans that he or she may not otherwise obtain. The VA Home Loans program is often used to obtain home loans with no money down.[7]

45.     Although the loans are partially backed by the VA, the borrowers use private mortgage brokers—just as anyone else does in buying a home. To that extent, although there is some paperwork involved in obtaining "automatic" VA lending authority, there is otherwise no unique connection between a broker who offers VA home loans and the U.S. government, including the VA.[8] As detailed herein, however, Veterans United Home Loans and Realty Search Solutions, LLC create the false impression that Veterans United is uniquely situated to provide VA-backed loans.

46.     Additionally, a lender issuing VA-backed loans must comply with VA policies and procedures. *See* 38 U.S.C.A. § 3702. The VA issues a Lender's Handbook that outlines the responsibilities of lenders issuing VA-backed loans.

47.     Veterans United Home Loans does not fully comply with the Lender's Handbook. The handbook specifically states that "[t]he VA Home Loan program involves a veteran's benefit. VA policy has evolved around the objective of helping the veteran to use his or her home loan

---

[7] https://www.benefits.va.gov/homeloans/index.asp (last visited May 4, 2026).

[8] https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000314438/VA-Pamphlet-VAP26-7-Chapter-01-Lender-Approval-Guidelines (last visited May 4, 2026).

011364-11/3557875 V1

benefit. Therefore, VA regulations limit the fees that the veteran can pay to obtain a loan."[9] Veterans United steering scheme does not "involve the veteran's benefit." *Id.* Rather, the steering scheme overcharges veterans in order for Veterans United to have a greater profit.

48.     Moreover, Veterans United Home Loan's appraisal processes are out of line with the Lenders Handbook and other pertinent regulations. Lenders are required to use "due diligence" when making appraisals. 38 C.F.R. § 36.4347 As detailed herein, Veterans United Home Loans abuses the appraisal process and provides inadequate appraisals to raise interest rates and increase mortgages on properties. These practices do not adhere to "high standards of integrity" that protect "the interests of Veterans." *Id.*

**C.     Veterans United's Fraudulent Conduct and Illegal Steering**

**1.     Veterans United's Misleading Advertising**

49.     As noted above, Veterans United falsely presents itself as being part of the VA. Defendants operate out of Columbia, Missouri, and the following misleading advertisements stem from actions taken in Missouri. The front page of the Veterans United Home Loans website (veteransunited.com) features images that resemble the American flag in two locations—in its logo, and on the keychain presumably holding the key to the buyer's home. The website's most prominent text promotes itself as "The Nation's #1 VA Lender," with a tiny disclaimer at the top, in light blue lettering that blends into the background (red border added here; disclaimer language magnified from original screenshot):

---

[9] U.S. Dep't of Veterans Affairs, Veterans Benefits Administration, VA Pamphlet 26-7, Lenders Handbook, ch. 8, Borrower Fees and Charges and the VA Funding Fee (rev. ed. 2025), https://www.knowva.ebenefits.va.gov/system/templates/selfservice/va_ssnew/help/customer/locale/en-US/portal/554400000001018/content/554400000314677/VA-Pamphlet-VAP26-7-Chapter-08-Borrower-Fees-and-Charges-and-the-VA-Funding-Fee (last visited May 1, 2026).

011364-11/3557875 V1



50.     There is no reason for this miniscule, hidden disclaimer *other* than to fool home buyers into believing that it is part of, or affiliated with, the VA. The website is inherently misleading.

51.     The first Complaint expanded the disclosure language from the screenshot in the Complaint, along with a red highlighted box, because otherwise the disclosure was impossible to read in the Complaint. *See* Complaint (Dkt. No. 1) ¶ 32. Veterans United subsequently complained that Plaintiffs should zoom onto the website itself, then expand the disclosure. This does not mimic typical consumer behavior.[10] Nevertheless, to give Veterans United every benefit of the doubt, Plaintiffs have done so below, even though this makes the disclosure bigger and clearer than it is on the website:

> Not a government agency. Private lender. Mortgage Research Center, LLC | NMLS #1907.

---

[10] Zooming in on the website before taking a screenshot, as Defendants do in Exhibit C to their Motion to Dismiss (Dkt. No. 23-4), is nonsensical because that is not what a user does. And the fact that Defendants ask this Court to enlarge the alleged disclaimer in order to read it proves that the disclaims is intentionally rendered in illegible fine print.

011364-11/3557875 V1

52.     Notwithstanding Veterans United's complaints, the websites should be viewed online to resolve any doubts about their legibility (although it appears that Veterans United increased the size of the disclaimer language after Plaintiffs filed their initial Complaint).[11] Other websites are even harder to read. Provided below are a series of images that Plaintiffs have not blown up and highlighted with a red box. In a Facebook ad, Veterans United's disclaimer is displayed for only one second in miniscule, barely visible font.[12]



53.     Other Facebook Ads similarly display miniscule disclaimers while simultaneously making Veterans United seem affiliated with the VA.[13]

---

[11] *Compare* veteransunited.com *with* https://web.archive.org/web/20260118070925/https://www.veteransunited.com/ (last visited May 4, 2026).

[12] https://www.facebook.com/watch/?v=1410912640384406 (last visited May 4, 2026).

[13] https://www.facebook.com/share/v/1Dzn2VCao8/ (last visited May 4, 2026); https://www.facebook.com/share/r/1EhA57juKS/ (last visited May 4, 2026); https://www.facebook.com/share/v/1DjEswdu9z/ (last visited May 4, 2026); https://www.facebook.com/share/r/1EVLJMsTza/ (last visited May 4, 2026).

011364-11/3557875 V1



011364-11/3557875 V1



**Veterans United**
April 17 at 3:40 PM · ⚙

This was more than a trip—it was a full circle moment. For many Vietnam Veterans, the "welcome home" they deserved never came. Decades later, we had the honor of helpin... **See more**

👍 165  💬 31  ↗ 27     👍❤️🥰

**View more comments**

011364-11/3557875 V1



011364-11/3557875 V1



54.    Similarly, Veterans United's Instagram posts only show disclaimers in tiny font.[14]

___

[14] https://www.instagram.com/reel/DXfAihaEQfN/?igsh=b3FhOWE2cXFybGV6 (last visited May 4, 2026); https://www.instagram.com/p/DXfCi_iAKhW/?igsh=OXJ0amEyNThtanZi (last visited May 4, 2026);
https://www.instagram.com/p/DVQ7pEBlpft/?igsh=MTFvbjJnaWFocG44ZA== (last visited May 4, 2026);
https://www.instagram.com/p/DW4I06NCdXB/?igsh=MWV1NXZ6YnZqeWthdQ== (last visited May 4, 2026);
https://www.instagram.com/p/DW7L63_j0xI/?igsh=MWFibXBodG00dGFpMQ== (last visited

011364-11/3557875 V1





011364-11/3557875 V1



011364-11/3557875 V1



011364-11/3557875 V1



55.     In yet another ad, Veterans United promotes itself as "we're more than a company"

011364-11/3557875 V1



At Veterans United, We're More Than a Company

Veterans United
21.9K subscribers
Subscribe
🖒 13 | 🖓 | ↪ Share | 🔖 Save | •••

56. The ad goes on to say that Veterans United measures success based on the "positive impact" to its clients and that they are "proud to serve veterans." A disclaimer only appears in the last few seconds of the video in small text.[15]

57. Some of Veterans United's promotional material does not even include a disclaimer. Veterans United provides a brochure online that encourages veterans to use their mortgage services. This brochure does not include a disclaimer anywhere in the brochure; produced below is an excerpt.[16]

---

[15] https://youtube.com/watch?v=hmRCfOSBeeM?si=hEY1NX90ZmZU1oil (last visited May 4, 2026).

[16] https://www.veteransunited.com/resources/assets/five-simple-steps.pdf (last visited May 4, 2026).

011364-11/3557875 V1



**2 Preapproval**

Preapproval takes place directly after prequalification and requires a deeper look at your financial situation. But this step, while also non-binding, carries much more weight with sellers and real estate agents. In this step, you must complete a loan application and provide your loan officer with pay stubs, tax returns and other financial statements.

During this step, Veterans United Home Loans will obtain your Certificate of Eligibility, a formal document that explains what VA entitlement you possess.

Preapproved borrowers will receive a preapproval letter, which explains that you are approved for a home loan provided certain conditions are met. Loan preapproval is not a guarantee that you will get a mortgage.

Veterans United
Home Loans
1-888-212-1958

2

58.     Veterans United also has Facebook posts that do not include disclosures, and further promotes the false belief that Veterans United is affiliated with the VA.[17]

---

[17] https://www.facebook.com/share/p/1EQpcFU79a/ (last visited May 4, 2026); https://fb.me/e/6p2RtblTb; https://www.facebook.com/share/p/18ZBbc7uNU/ (last visited May 4, 2026).

011364-11/3557875 V1



011364-11/3557875 V1



011364-11/3557875 V1



59. As reflected in this advertising, Veterans United Home Loans has the highest volume of VA loans because homebuyers assume that Veterans United is part of the VA. This is no accident. It is the intended goal of Veterans United's marketing campaign. As detailed below, real estate agents and loan officers confirm that Veterans United's success *depends* on misleading active U.S. military and Veterans into thinking that they are dealing with "the VA," or at least an entity affiliated with the VA. Individual Plaintiffs in this case concur. *See supra* § II.A. In reality,

011364-11/3557875 V1

Veterans United has the same connection to the VA as any other mortgage broker who is qualified to offer VA loans.

**2.      Veterans United's Illegal Steering**

60.     As referenced above, the first page users see when they visit veteransunited.com is the following screen:



61.     By clicking the yellow "Continue" button on the home screen, the Veterans United Home Loans website (veteransunited.com) guides the user through a series of questions that are designed to gather intelligence on the home buyer to feed to the Network Agents in Veterans United's network; they are unrelated to assessing whether the home buyer is qualified to get a loan. For example, if the user expresses an interest in getting a loan, Veterans United Home Loans asks the following questions:

011364-11/3557875 V1





011364-11/3557875 V1



62. These questions serve no purpose other than to feed information to the Network Agents, so they can convince customers to use them to buy a home. Veterans United wants customers to use the Network Agents because it receives a 35% kickback from them, and the Network Agents help ensure that Veterans United Home Loans is ultimately used for the home buyer's mortgage.

63. Veterans United also has a real estate business, Veterans United Realty. Based on the fact that Veterans United Realty has few practicing real estate agents on staff outside of Missouri who actually buy or sell homes, Veterans United Realty appears to have been created only to evade restrictions on payments from brokers to non-brokers. Veterans United Realty has "over 5,000 network agents" who are not employees of Veterans United Realty.[18]

64. Veterans United Realty acknowledges this reality whenever there are complaints about Network Agents. In a response to a Better Business Bureau complaint about one of the Network Agents, Veterans United Realty stated the following: "I believe there is some confusion on our business model – Veterans United Realty is a real estate referral network. We refer

---

[18] https://www.veteransunitedrealty.com/about/ (last visited May 4, 2026).

011364-11/3557875 V1

homebuyers to real estate agents nationwide. Those real estate agents are not our employees and are in charge of creating and maintaining their own emails and security around those emails."[19] On that same page, in response to a different complaint, Veterans United Realty stated, "We operate a referral network, and such were not a party to the [property] transaction."[20]

65. Veterans United Realty is a shell company whose website is just as misleading as Veterans United Home Loans' website.[21] In fact, Veterans United Realty's website does not contain any disclaimer on the top of the screen at all:[22]

---

[19] https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints (last visited May 4, 2026).

[20] https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints (last visited May 4, 2026).

[21] In fact, if a user clicks on the "Careers" icon at the bottom of the Veterans United Realty website, the user is directed to Veterans United Home Loans. *See* https://careers.veterans united.com/teams/veterans-united-realty/ (last visited May 4, 2026).

[22] https://www.veteransunitedrealty.com/lp/v2/?src=vurppc&adg=123981392542&desc= available&cmp=brand&matchtype=e&adid=683611482888&targetid=aud-2356546975607:kwd-313423381829&campaignid=14490247100&label=&extid=&phyloc=9060414&gad_source=1& gad_campaignid=14490247100&gbraid=0AAAAABOdbkfBCjD28BnU_eOBXSPreGl32&gclid =CjwKCAiAtLvMBhB_EiwA1u6_PiIYpzPBSbJFTSh47_X1hoX1r_fY48ffM68nu7lOrJtH6zwu _YA0BBoCTBMQAvD_BwE (last visited May 4, 2026).

011364-11/3557875 V1

43



66.     The user would need to scroll to the bottom to see any disclaimer, again written in light blue font against a dark blue background:



67.     Just as with Veterans United Home Loans, there is no reason to make the disclaimer so tiny other than to deceive. When Veterans United Realty wants the words to be actually legible against a dark blue background, they use *white* lettering.

011364-11/3557875 V1
44

68.     Equally deceptive is the suggestion that Veterans United Realty actually offers buyers a Veterans United agent. Also contained in the tiny disclaimer above is that "We may share customer information with our trusted affiliates to assist you with your home search." But in truth, Veterans United Realty will *always* share customer information because Veterans United Realty does not have its own practicing real estate agents on staff who buy and sell homes outside of Missouri. Veterans United, by its own admission, explains that they are a "real estate referral network" and the "real estate agents are not our employees."[23] Veterans United has a broker in each state, but its website explains that they work with "over 5,000 network agents" —strongly indicating that Veterans United Realty does not have real estate agents as employees over a de minimus amount.[24] Veterans United Realty only exists so that Veterans United can receive kickbacks from a fleet of Network Agents.[25]

69.     Defendants have accordingly positioned themselves to capture and steer home buyers regardless of how these buyers began their house search. If the buyers first sought to get pre-approved through Veterans United Home Loans, then those buyers would be referred to Network Agents in the Veterans United Realty network who steered clients away from other lender lenders and, instead, steered them back to Veterans United Home Loans.

---

[23]  Veterans United Realty, *Better Business Bureau* (2025), https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints     (last visited May 4, 2026).

[24] About     Veterans     United     Realty,     *Veterans     United     Realty*, https://www.veteransunitedrealty.com/about/ (last visited May 4, 2026)

[25] Veterans     United     Realty,     *Better     Business     Bureau*     (2025),     https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints     (last visited  May  4,  2026)  (Veterans  United  explains  that  their  business  model  simply  "refer[s] homebuyers  to  real  estate  agents  nationwide"  showing  that  the  brokerage  itself  does  not  offer homebuyers real estate services or provide homebuyers with in-house real estate agents.).

011364-11/3557875 V1

70. Notably, getting a pre-approval letter is just an initial step in the homebuying process: a substantial number of potential buyers obtain a mortgage through other lenders. As the CFPB itself notes, "[g]etting a preapproval doesn't commit you to using that lender for your loan."[26]

71. If buyers first visited veteransunitedrealty.com, the outcome is the same, although the process is different. In that case, Veterans United Realty (through its parent company, Realty Search Solutions Network, LLC) referred leads to agents in the network, making it clear that these agents were expected to steer leads back to Veterans United Home Loans. These expectations were laid out partly in its "Agent Expectations" document.[27] It begins with the statement that "Veterans United Realty is focused on creating quality relationships between experienced real estate Agents, VA specialized Loan Officers and our clients." The "VA specialized Loan Officers" are plainly Veterans United Home Loan officers; at this point, *the buyer has not selected a loan officer yet*. The "Loan Officer" is assigned to the agent *by Veterans United Realty*. It further advises (or warns) network agents to "Reinforce existing relationships with the client's Loan Officer."

72. Veterans United takes another step to monitor compliance with its steering program by directing agents to use an app called "AgentDash," which is proprietary to the Defendants.[28] AgentDash promotes itself to agents as a means of keeping all information in one place:

---

[26] https://www.consumerfinance.gov/owning-a-home/explore/get-a-preapproval-letter/ (last visited May 4, 2026).

[27] https://www.veteransunitedrealty.com/assets/pdfs/agent-expectations.pdf (last visited May 1, 2026).

[28] *See* https://app.myagentdash.com/welcome?postLoginTargetPath=%2Flogin (last visited May 4, 2026).

011364-11/3557875 V1

**Streamline your real estate transactions**

With everything in one place, it's easier than ever to get leads and help clients into homes.

73. By keeping "everything in one place," Defendants can monitor agents' communications, who are told to "leav[e] concise notes on client progress."[29] Agents are also told to "[w]ork with the loan team to create a game plan on how to best serve the client as a cooperative team." The "cooperative team" here is the agent and the loan officer, along with a "Network Development Coach" assigned to the agent. In fact, agents are required to notify Veterans United Home Loans and their "Network Development Coach" "in the event a client pursues other lending options."[30] The implication is clear: agents are monitored to ensure they are steering clients, and if they are initially unsuccessful, they must immediately inform Veterans United Home Loans.

74. The whole process is designed to always loop back to Veterans United Home Loans. For example, if agents are having difficulties with the AgentDash app, they are advised to email "agentupdates@vu.com." If home buyers visit the website "Vu.com," they are directed to Veterans United Home Loans, not Veterans United Realty. And Veterans United Realty's website promotes its connection with Veterans United Home Loans based on the latter's position as the "#1 VA Lender."

---

[29] *See* https://help.myagentdash.com/en/articles/3902803-our-network-expectations (last visited May 4, 2026).

[30] *See* https://help.myagentdash.com/en/articles/3902803-our-network-expectations (last visited May 4, 2026).

011364-11/3557875 V1

75. Network Agents are further instructed to contact "AgentTraining@veteransunited.com" if they are having any difficulties with the training platform.[31] And like "vu.com," the website "veteransunited.com" belongs to Veterans United Home Loans, not Veterans United Realty.

76. In sum, when these Network Agents have questions about how to operate as a Network Agent, they are directed to Veterans United Homes Loans, *not* Veterans United Realty. This is clear evidence that the mortgage lender – Veterans United Home Loans – directs the conduct of the Network Agents, who Defendants now pretend have no affiliation or allegiance to Veterans United Home Loans.

77. In addition, on the actual website for Veterans United Realty (https://www.veteransunitedrealty.com/), the Network Agent is told that Veterans United Home Loans is the "#1 VA Lender" and that "Veterans United Home Loans provided more VA Home Loans by volume than any other lender as of Oct. 2025."

78. Thus, the homepage of Veterans United Realty's own website promotes loans from Veterans United Home Loans. Veterans United Realty's website does not mention any other mortgage lender, including those with less expensive loans.

**D.      Testimonials from Current Real Estate Agents and Loan Officers**

79. Current real estate agents and bank loan officers have offered accounts of their experience with Veterans United Home Loans, all of which are consistent with and corroborate each other. As presented below, these real estate agents and loan officers have first-hand

---

[31] *See* https://help.myagentdash.com/en/articles/6649520-network-academy-faqs (last visited May 4, 2026).

011364-11/3557875 V1

experience with Defendants' illegal steering and deceptive practices, and the financial impact of these practices on active U.S. military and Veterans.

### 1. Confidential Real Estate Agent 1

80. Confidential Real Estate Agent 1 ("CA1") is a real estate broker with decades of experience in the industry. According to CA1, Veterans United often leads buyers into believing they are dealing "with the VA" or otherwise believing that Veterans United is affiliated with the federal government. According to CA1, Veterans United works with certain third-party agents and sends them pre-qualified buyers. If the agents close on the sale, they pay approximately 35% of the commission back to Veterans United. In addition, these agents are expected to keep the buyer with Veterans United Home Loans and are strongly discouraged from giving the buyer other mortgage options or seeking competitive bids, thereby completing the exchange of a thing of value between the agents and Veterans United. If agents do not keep these clients with Veterans United, Veterans United will stop sending the agents leads.

81. According to CA1, Veterans United's practices and conduct are a disservice to its clients in the military because Veterans United's loan packages are often more expensive than its competitors. Veterans United also does not provide information to clients about additional options they have to finance the purchase of their home, including first time home buyers' assistance programs.

82. According to CA1, and in CA1's experience, the agents that receive leads from Veterans United tend to be less experienced and knowledgeable. However, clients tend to stick with these agents for the purchase of their homes, because the clients are under the impression that they have no other viable option than to work with these agents or these mortgage providers.

011364-11/3557875 V1

### 2. Confidential Real Estate Agent 2

83. Confidential Real Estate Agent 2 ("CA2") has been a real estate agent for over six years in the mid-Atlantic region and serves a large portion of the U.S. active duty and veteran community.

84. According to CA2, Veterans United sends leads to specific real estate agents. If these agents close the sale, the agents are required to pay back a portion of their commissions to Veterans United. This payment is not disclosed to the clients. In addition, Veterans United requires agents to steer clients to Veterans United Home Loans for loans—and not provide information on other lenders, even though other lenders can offer better rates. If agents do not steer clients to Veterans United Home Loans, Veterans United Realty and Veterans United Home Loans cut off their leads. According to CA2, this is a breach of an agent's fiduciary duty to put the needs of the clients first.

85. According to CA2 and based on CA2's experience, clients who are active military or veterans believe that Veterans United is "the VA." According to CA2, this practice is predatory, because Veterans United is deceiving clients into believing that Veterans United is with the federal government, and taking advantage of these first-time home buyers who believe they are dealing with the VA. In addition, many clients believe that they must work with a "VA agent" to secure the loan. CA2 has lost many clients based on their false belief that they were required to use a "VA agent." According to CA2, this deception is part of the reason why Veterans United is the number one provider of VA-backed loans in the country.

### 3. Confidential Real Estate Agent 3

86. Confidential Real Estate Agent 3 ("CA3") has been in real estate since 2021 in California. CA3's clientele includes many active U.S. military personnel.

011364-11/3557875 V1

87. According to CA3, Veterans United requires agents in the Veterans United Realty network to use Veterans United Home Loans. If an agent gets a lead from Veterans United and the client is pre-approved through Veterans United, but the client uses another lender, the agent is dropped from the network. According to CA3, agents are not permitted to refer clients to other lenders, even though the closing costs at Veterans United Home Loans are very high, and the clients could find less costly options elsewhere. This is a particular disservice to active military community, who typically do not have sufficient capital for excessively high closing costs. As a result, the closing costs get wrapped into the loan, which results in a larger loan and larger loan payments.

88. According to CA3, and based on CA3's experience, active military personnel are loyal to Veterans United because they believe that Veterans United is part of the VA.

### 4. Confidential Real Estate Agent 4

89. Confidential Real Estate Agent 4 ("CA4") has been a real estate agent for over 20 years in the mountain West region of the country and has extensive experience working with agents who are part of the Veterans United Realty network. According to CA4, Veterans United Home Loans pre-approves buyers and sends these leads to realtors in the Veterans United Realty "network." These agents then pay Veterans United Realty ) a referral fee of approximately 35%. According to CA4, this fee is not disclosed to the client. In addition, according to CA4, Veterans United Realty does not actually engage in real estate sales; Veterans United Realty is formed simply to collect the referral fees.

90. According to CA4, if the agent does not keep the lead with Veterans United Home Loans, the agent will not receive any further leads from Veterans United. According to CA4, this structure means that the agents do not tell homebuyers that Veterans United's fees or rates are high, because the agents want to keep the leads flowing in the future.

011364-11/3557875 V1

### 5. Confidential Real Estate Agent 5

91. Confidential Real Estate Agent 5 ("CA5") has been a real estate agent for more than 15 years in the southeastern part of the United States. A substantial majority of CA5's clientele are current members of the military or otherwise qualify for VA home buying assistance.

92. According to CA5, Veterans United provides referrals to third-party agents, in the form of potential buyers looking for home to buy. If these agents close on the referrals, they are required to pay Veterans United 30-40% of the commission earned on the sale.

93. According to CA5, about 10 years ago Veterans United began a practice of telling clients that if they use their "Network Agents" (the third-party agents receiving leads), then the clients will receive a break on the mortgage in form of reduced loan costs. Veterans United also states or suggests that the clients have no choice but to use these Network Agents. However, according to CA5, Veterans United Home Loans' mortgage fees are astronomical, such that the promised loan costs are illusory; even with the purported cost reductions, Veterans United Home Loans are still more expensive than its competitors. These "Network Agents," in turn, are referring future clients to Veterans United. Thus, both Veterans United and the agents are giving and receiving a thing of value, in violation of RESPA.

94. According to CA5, many clients are also deceived into believing that Veterans United is affiliated with the federal government, particularly the Veterans Administration. CA5 has had clients tell CA5 that the "VA" is telling them that they have to use these Network Agents. CA5 has lost many clients who have been duped by Veterans United into believing that Veterans United is part of the government, and/or that the clients have to use Veterans United's Network Agents.

011364-11/3557875 V1

### 6. Confidential Loan Officer 1

95. Confidential Bank Loan Officer 1 ("CO1") has been a loan officer for over 16 years and currently works in southeastern part of the United States. With several military bases in the area, a substantial portion of CO1's business is with veterans, both active duty and retired.

96. According to CO1, some real estate agents in CO1's area receive leads from Veterans United, and these agents must pay a portion of their commission back to Veterans United if the deal closes. These agents are also required to steer their clients back to Veterans United Home Loans . If the agents fail to do so, their leads from Veterans United Home Loans and Veterans United Realty are at risk of being cut off. Based on CO1's experience, agents participating in the referral program refuse to provide their clients with any alternative lending options other than Veterans United Home Loans because they do not want to get dropped from the program.

97. According to CO1, this practice is a significant disservice to veterans and active military because Veteran United Home Loans offers much more costly mortgage terms than available alternatives, including in fees, costs, and higher interest rates. According to CO1, his/her rates currently were up to one half percent lower than what Veterans United Home Loans were offering. Many real estate agents realize that Veterans United Home Loans has worse loan terms than other competitors but do not offer them another lending option for fear of losing the referral source by Veterans United.

98. According to CO1, Veterans United gives the impression to its clients that it is "the VA," or at least affiliated with the federal government. Based on that false impression, many clients feel like they should or must use Veterans United for their loans.

011364-11/3557875 V1

**7.    Confidential Loan Officer 2**

99.    According to Confidential Loan Officer 2 ("CO2"), who has served in lending and the real estate industry in the Pacific Northwest for over 30 years, there is a pattern of veterans being drawn in by Veteran United's branding and name recognition, but then the veterans receive incomplete or inaccurate guidance. On multiple occasions, CO2 has seen CO2's clients, who previously tried to use Veterans United, become confused and frustrated based on unclear explanations, inconsistent information, and no meaningful coaching from Veterans United on how to qualify under VA guidelines.

100.    According to CO2, a recurring issue is veterans being told they do not qualify (or cannot qualify) without a clear, guideline-based explanation, or without exploring common VA solutions (including addressing residual income, correct treatment of variable income, correct handling of debts/DTI, credit re-establishment strategies, or documented compensating factors). In at least three instances within the last six months, CO2 was able to restructure the scenario and move the borrower forward successfully after they were essentially "stopped" by Veterans United Home Loans.

101.    According to CO2, another consistent complaint from veterans is that the loan was presented as "VA-friendly," but the actual cost structure was inflated or poorly explained. This includes confusion around origination charges, discount points, lender fees vs. third-party fees, and whether the borrower is truly receiving competitive pricing. According to CO2, Veteran United Home Loans's financial terms are often materially higher than what is available in the broader market for the same borrower profile.

102.    According to CO2, veterans repeatedly describe working with Veterans United Home Loans loan officers who appear inexperienced with VA nuances and who rely on scripted answers rather than problem-solving. Based on CO2's experience, VA lending requires detailed,

011364-11/3557875 V1

situation-specific guidance, especially for first-time VA users. According to CO2, when that expertise is missing, veterans are more likely to be misinformed, overcharged, or needlessly turned away and completely frustrated.

### 8. Confidential Loan Officer 3

103. Confidential Loan Officer 3 ("CO3") is a U.S. military Veteran and mortgage broker from the Mountain West area of the United States. According to CO3, most people do not understand how mortgages work. Veterans United has taken advantage of this lack of knowledge to exploit U.S. service members and Veterans. Specifically, according to CO3, Veterans United Home Loans and Veterans United Realty markets itself in a manner to create the impression that it is "part of" the VA. CO3 frequently has potential clients tell him/her that they got a loan quote "from the VA," but nearly every time, the quote is from Veterans United. Further, Veterans United employees and personnel do not dissuade anyone from the belief that it is part of the VA.

104. CO3's military service involved some contact with members of Congress. According to CO3, executives at Veterans United often testify on the hill or meet with Members of Congress as purported experts on VA loans simply because of Veterans United's loan volume. This is another instance in which Veterans United portrays itself as being uniquely connected to the VA.

105. According to CO3, another tactic by Veterans United is to promote its "Military Advisors," which further blurs the line between Veterans United and the VA. Below is an example from Veterans United's website, including a military officer proclaiming that "*Veterans United embodies all the values of military service*[.]":[32]

---

[32] *See* https://www.veteransunited.com/about/military-advisors/ (last visited May 4, 2026).

011364-11/3557875 V1

55



**· MEET THE ·**

# Veterans United Military Advisors

Veterans United Home Loans is honored to work with former senior enlisted leaders from each branch of the Armed Forces. Meet the men and women who have made it their mission to educate Veterans about homeownership and the power of VA Loans.

Our military advisors are paid employees of Veterans United Home Loans.

## Jason Vanderhaden

**13th Master Chief Petty Officer of the Coast Guard**

*"I'm honored to serve as a Military Advisor to Veterans United. The team at Veterans United is dedicated to providing an outstanding array of services to our service members and veterans. Veterans United embodies all the values of military service and is passionate about improving the quality of life of military members and their families."*

**Decorations & Distinctions**

- 34 Years of service
- Distinguished Service Medal
- Legion of Merit
- Meritorious Service Medal (2)
- Coast Guard Commendation Medal (3)
- Coast Guard Achievement Medal (4)

106. In addition, according to CO3, under the VA loan program, an appraisal belongs to the Veteran or service member; they can choose any lender they want. The appraisal is easily passed to other lenders. However, CO3 had a client that wanted to use CO3's services, but the Veterans United Home Loans representative refused to transfer the appraisal. (CO3 was in a position to save the client about $8,000, because of the inflated costs and interest rates Veterans United was going to charge). The Veterans United Home Loans rep stated that there was no way to transfer the appraisal, which is not correct. CO3 had to call the VA to ask the VA to transfer the appraisal, but without this intervention, the client was faced with several months of delay and possibly lose the home altogether as he would have lost his place in line for his appraisal (in a very high demand county).

107. According to CO3, one of the most disturbing practices of Veterans United is falsely telling Veterans and service members that they do not qualify for a VA loan, because they do not meet credit score requirements. CO3 has had clients tell him/her that "the VA told me that

011364-11/3557875 V1

I don't qualify because my credit score is too low." This is false; there is no minimum credit score to qualify for a VA loan. Veterans United has simply decided to not take the risk associated with borrowers with lower credit, so it falsely tells borrowers that they do not qualify for VA loans. In CO3's experience, Veterans United Home Loans turns away Veterans and service members more than most other lenders because of its refusal to lend to individuals with lower credit scores.

108. According to CO3, Veterans United's loans are almost always more expensive. Veterans United charges a 1% origination fee, just for the "privilege" of doing the loan. CO3 is typically able to offer a loan that is $5,000 to $10,000 cheaper than a Veterans United loan.

109. CO3 has heard from others in the industry that Veterans United will offer a floating rate to a potential buyer, but then increase the locked rate after the appraisal, on the false pretense that during the wait for the appraisal the terms of the loan changed. But this is incorrect; loan officers do not need an appraisal in order to set loan terms. A loan proposal can simply be based on the anticipated purchase price of the home. But once homebuyers obtain the initial floating interest rate proposal and sign some paperwork, they believe that they are required to use Veterans United, so they later agree to the higher rate.

110. Overall, CO3 strongly believes that Veterans United is preying on current service members and Veterans by trading in on its purported connection with the VA to sign up service and members and Veterans with higher priced loans, with no regard to their interests.

### 9. Confidential Loan Officer 4

111. Confidential Loan Officer 4 ("CO4") has been a mortgage broker for nearly 15 years in the mid-Atlantic region of the United States. Most of his/her clients qualify for VA loans. According to CO4, Veterans United's loans have higher costs and higher interest rates compared to other homes. In CO4's experience, real estate agents who are part of the Veterans United network discourage clients from shopping around for cheaper loans because Veterans

011364-11/3557875 V1

United tracks who clients use. If a real estate agent does not successfully steer clients to Veteran United Home Loans, they stop receiving leads and are dropped from the network. CO4 believes that this is not fair to clients, who should have the opportunity to find cheaper loans.

### 10. Confidential Loan Officer 5

112. Confidential Loan Officer 5 ("CO5") is a former U.S. Army Officer who was in active duty for over eight years. CO5 has been working as a loan officer for over 10 years in the Southwest region of the United States.

113. CO5 believes that Veterans United is a predatory lender that routinely charges Veterans thousands of dollars more for loans. Veterans United offers higher interest rates, and charges much higher fees, making Veterans United a tremendous amount of profit. According to CO5, Veterans United Home Loans and Veterans United Realty is essentially a marketing company that spends millions of dollars marketing itself as a VA company, even as it has loan officers that are unprofessional, untrained, and bad at their job, which leads to unnecessary delays and higher costs.

114. According to CO5, Veterans United presents itself as part of the VA. Borrowers tell CO5 that they thought they had no choice but to use Veterans United because they were part of the VA. CO5 has also heard that Veterans United personnel will answer the phone by stating "Veterans Department."

115. According to CO5, real estate agents are forced to steer clients to use Veterans United Home Loans. If they don't, they no longer get leads and they are dropped from the program. Veterans United tracks every home buyer, and if it sees an agent referring clients to other mortgage providers, Veterans United threatens to cut them off.

011364-11/3557875 V1

### 11. Confidential Loan Officer 6

116. Confidential Loan Officer 6 ("CO6") has been a loan officer for over 15 years in the mid-Atlantic region of the United States. According to CO6, Veterans United portrays itself as part of the VA, and Veterans United personnel do not correct this misconception. Over half of CO6's business is with Veteran and service members, and they routinely tell him/her that they "spoke with the VA."

117. In CO6's home state, the state offers qualified borrowers a 2% grant to subsidize home purchases using a VA loan. This reduces the out of pocket costs for military families at closing. Veterans United Home Loans does not participate in this program, even though it could save Veterans and active military members costs on closing.

118. According to CO6, real estate agents that receive leads from Veterans United have to kick back 35% of the commission to Veterans United. In addition, if these real estate agents do not steer clients to Veterans United Home Loans, their leads are cut off.

119. CO6 believes that Veterans United's practices are inconsistent with the duty and obligation for real estate agents to prioritize and serve their clients' interests.

### 12. Confidential Loan Officer 7

120. Confidential Loan Officer 7 ("CO7") is a mortgage broker in the Mid-Atlantic portion of the United States who has been working in the mortgage business for over 15 years.

121. According to CO7, Veterans United intentionally offers artificially favorable terms during the "shopping" phase (when borrowers are searching for preliminary rates that are not locked), only to raise the costs and interest rates at the "lock" phase. Throughout CO7's career, he/she has heard numerous accounts from both consumers and industry professionals explaining how Veterans United engages in this type of bait-and-switch conduct. According to CO7, the anecdotal evidence is overwhelming.

011364-11/3557875 V1

122. For example, according to CO7, presented below are two loan offers from Veterans United Home Loans to a home buyer, separated by just three days apart:



123. The floating rate on October 30 was 6.5%, and the fixed rate on November 2 was 6.75%. According to CO7, interest rates can and do fluctuate daily (or even during the day), but during this three-day window of time the cost of a loan had improved significantly. CO7 reviewed the loan rates at three wholesales and computed an aggregate average of the rates. The aggregate average of the three wholesalers are as follows, with a minus sign indicating a cost and a plus sign indicating a credit:

011364-11/3557875 V1

|  | Oct. 30, 2023 | | Nov. 2, 2023 | |
| --- | --- | --- | --- | --- |
|  | 6.5% | 6.75% | 6.5% | 6.75% |
| **Aggregate average** | -1.362% | +.135% | -.25% | +1.048% |

124.    As the above chart demonstrates, the cost of a loan from October 30, 2023 to November 2, 2023 improved; the 6.5% loan cost less according to the aggregated rate, and the 6.75% loan resulted in more credit back to the borrower. The aggragated average cost to move from a 6.5% rate on October 30 to a 6.75% rate on November 2 improved by 2.41%:

6.5% loan cost on Oct. 30, 2023:        **-1.362%**

6.75% loan cost on Nov. 2, 2023:        **+1.048%**

Difference:                                              **2.41%**

125.    However, according to CO7, the all-in price of the loan for Veterans United Home Loans became *more expensive* for the borrower, as follows:

|  | Oct. 30, 2023 quote | Nov. 2, 2023 quote |
| --- | --- | --- |
| Interest rate | 6.5% | 6.75% |
| Loan origination costs | $3,829 | $5,744 |
| (less credits) | $0 | ($2,604) |
| Total costs | $3,829 | $3,140 |

126.    On October 30, 2023, the aggregate average cost of a 6.5% loan was (1.362%) * $306,347 = $4,172, which is close to what the borrower was quoted before the rate was fixed. But on November 2, 2023, according to the aggregate average, a 6.75% loan resulted in a credit of 1.048%* $306,347 = $3,210. Instead, the borrower *paid* $3,140 in costs. In sum, the change cost the borrower $3,210 + $3,140 = $6,350 more than he/she was originally quoted, even though the market improved during that period.

127.    According to CO7, lender costs between the two loan estimates should remain substantially similar. From CO7's experience, this discrepancy cannot be reasonably explained by

011364-11/3557875 V1

market movement alone, and instead suggests that the initial loan estimate may have reflected artificially reduced margins that were later increased when the loan was locked.

128. According to CO7, and in his/her experience, real estate agents who work in Veterans United's agent referral network believe that Veterans United's loan terms, underwriting processes, and overall service were inferior. Despite these concerns, these agents felt compelled to continue referring clients to Veterans United Home Loans in order to maintain their participation in the referral network. According to CO7, these agents believe that the buyers would get better terms and service if the agents were able to refer them elsewhere.

### 13. Confidential Loan Officer 8

129. Confidential Loan Officer 8 ("CO8") has been a loan broker for over 20 years in the Pacific Northwest. According to CO8, Veterans United is a predatory lender that illegally steers clients to Veterans United Home Loans. Veterans United also falsely promotes itself as "VA specialists," which confusingly suggests that their loan officers are affiliated with the VA.

130. According to CO8, the data reveal the illegal steering. Typically, a real estate agent will develop a working relationship with a certain loan officer, and recommend that officer's name to clients if the agent believes the officer offers fair terms. However, when an agent refers clients to numerous loan officers on a one-off basis at the same company, that is an indicator that the agent is steering the client to a specific company, rather than recommending an individual officer who offers fair rates.

131. As an example, as alleged above (*see supra* ¶ 27), the real estate agent "C.C." steered class representative Jared Flores to use Veterans United Home Loans. According to CO8, based on publicly available data, in 22 buyer transactions in the last 24 months, C.C.'s clients used Veterans United 16 times (listed as "Mortgage Research Center, LLC"), with a different agent every single time. According to CO8, this data demonstrates overwhelming that C.C. is illegally

011364-11/3557875 V1

steering clients to Veterans United Home Loans. C.C is not recommending clients use specific loan officers from Veterans United. Instead, C.C. is steering clients to Veterans United Home Loans as a whole, irrespective of whether the specific loan officer is known to offer fair terms.

132. Similarly, as alleged above (*see supra* ¶ 31), the real estate agent "N.A." steered class representative Dawn Johnson to Veterans United Home Loans. According to CO8, based on publicly available data, in 20 buyer transactions in the last 24 months, N.A.'s clients used Veterans United 13 times, with a different agent every single time.

133. In another example, as alleged above (*see supra* ¶ 22), the real estate agent "B.B." steered class representative Jason Carson to use Veterans United Home Loans. Based on B.B.'s website, B.B. does not advertise him/herself as a VA specialist. According to CO8, based on publicly available data, in 30 buyer transactions in the last 24 months, B.B. used a single loan officer (not with Veterans United) for nine of those transactions, reflecting the normal pattern of an agent referring clients to an individual based on a working relationship. Of the remaining 21, 15 used Veterans United Home Loans, and the loan officer was different every time (with one exception).

**E.     Publicly Available Statements Corroborating Plaintiffs' Allegations**

134. Real estate agents and loan officers tend to be prolific on social media, and this case has generated widespread commentary by real estate agents and loan officers who often have their own You Tube channels or podcasts. The comments by these agents corroborate and confirm the accounts of the confidential witnesses. Taken together, they overwhelmingly demonstrate the Defendants' fraud and illegal conduct.

011364-11/3557875 V1

135. For example, loan officer Jennifer Beeston on her YouTube channel (with 205,000 subscribers) commented on the allegations in the initial complaint filed in this matter, and stated as follows:[33]

> What they're saying is that through the marketing that Veterans United has done for years, people actually think that Veterans United is affiliated with VA, that VA recommends them, etc., etc. Now, as a loan officer, have I had people say to me that they thought Veterans United was part of VA? Yes! Yes! Yes! For years, yes, of course. Look, Veterans United has in terms of effective marketing, the most effective marketing in the industry, bar none.

136. A fellow loan officer (Suzanne Caldeira) commented on the video (*id.*), "It's about time they got busted. I'm sick of them and their tactics. It's so true that they're cosplaying as if they're the government." Another user commented (in all caps) "YES I THOUGHT THEY WERE PART OF THE VA." Yet another stated "he told me their organization is preferred by va." Another viewer stated, "I dropped them during the buying process, very scammy, out right lies, high pressure and gaslighting."

137. Yet another user stated, "I am currently going thru the process with VA United. I had no idea they were not the VA. **They said they handle more VA loans with the VA because they have a unique partnership with the VA**… . It's no wonder they do more VA loans than anyone else. It's because people think, they are the VA… . **I hate that my real estate agent is getting a huge cut taken away. That's not right. It's no wonder I could not her to take a lower offer**. VA United already taken it." *Id.*

138. In a separate YouTube video, loan officer Jennifer Beeston mocked the idea that the kickback payments do not keep commissions artificially inflated. As she described it,[34]

---

[33] *See* https://www.youtube.com/watch?v=Zpop3SWCUqM (last visited May 4, 2026). All emphases in this section added.

[34] *See* https://www.youtube.com/watch?v=Ygl_u2n89Vs (last visited May 4, 2026).

011364-11/3557875 V1

Do you want the discount or do you think these corporations and realtors should get it? Oh, you want the discount? Of course. Look, if the mortgage lender isn't bribing the real estate agent to get business, they can offer you better rates and fees. That makes your cost of buying a house lower. If the platform or mortgage company isn't taking 35 to 40% commission of the real estate agent, well, guess what? When you go to negotiate your buyer's agreement, you've got a better chance of being able to negotiate them down and you getting that, in this case, $10,000 example, $3,5000 to $4,000.

139. Another commentator is Major Singleton. He served in the U.S. Navy for 23 years, and is currently a mortgage broker in Texas.[35] He was named the National Broker of the Year in 2024 by the Association of Independent Mortgage Experts.[36] Mr. Singleton posted a video on his Facebook channel regarding the current lawsuit, and stated the following:[37]

This happens to me all the time. People come to me, and are like … **I'm already pre-approved with the VA**. I'm like, what are you what are you talking about? You're pre approved with the VA. That doesn't happen, okay? The VA does not lend money ever on a mortgage. . . . **So we have a Veterans United lawsuit because of their deceptive business practices that they have been doing for years, and us as originators have been calling them out and saying, Hey, this is not true. You can't do this. You're misleading the veteran.** And now we finally have a lawsuit against Veterans United for all of their deceptive business practices.

140. Mr. Singleton then describes how Veterans United's loans are more expensive:

I am a part of the associated association of independent mortgage experts, and we do have documentation of this. We have loan estimates on this of stuff that they have done over the years and misleading and misrepresenting themselves to the veteran community. . . . The truth is, their higher rates, higher fees, and they are continuing to mislead veterans.

Okay, so let's talk about some of their specific things that they will do to mislead a veteran. Okay, number one, they do not they will say that you cannot lock in your rate until the appraisal comes back,

---

[35] https://www.linkedin.com/in/major-singleton/details/experience/ (last visited May 4, 2026).

[36] https://www.linkedin.com/posts/major-singleton_nationalbrokeroftheyear-aime-grateful-ugcPost-7241478296075468802-nr9g/ (last visited May 4, 2026).

[37] https://www.facebook.com/reel/1662844965128558 (last visited May 4, 2026).

011364-11/3557875 V1

okay? And then when the appraisal comes back, it gives them leverage to change the pricing on an interest rate and charge a higher rate.

141. Mr. Singleton also describes how Veterans United Home Loans uses the appraisal to effectively lock in home buyers to use Veterans United:

> The other part of that is if you wait until your appraisal comes back to lock in your loan, then you're already two three weeks into an escrow process, and are you going to switch lenders at that point when you're two to three weeks into an escrow process? The answer is absolutely not. You're not going to do that. You're going to say, well, crap. I don't like this interest rate. I don't like this deal, but, you know, I'm going to go ahead and take this interest rate and it's a load of crap. Okay? It's foolishness that Veterans United has been doing for years.

142. Finally, Mr. Singleton notes how the steering scheme prevents agents from providing their clients with objective advice about their loans:

> The other thing they're doing is listen this referral network with realtors… . I'm saying if a realtor tells you that you must work with Veterans United, or if a realtor tells you that you must work with any lender, they are lying. . . . You have realtors that may say to their clients that, you know, hey, you you have to work with Veterans United, and there is a kickback slash referral arrangement that's incorporated, maybe. And that is a RESPA violation
>
> []
>
> But you know this whole misleading of veterans and misleading of the veteran community and Veterans United, believing that, or making you believe that you have to work with them, or, you know, they are the VA and all that stuff, by the way, for years, Veterans United has been the top performing or originated more volume for years. They have done it for years. They are a marketing machine.

143. Others agree. As loan officer Jerry Kindig posted on Reddit, "I will always say this. Veterans United should be required to change their name, period. So many people think that they are connected to the VA and it's the way to get a VA loan. There's so many restrictions when it comes to mortgage company names to not mislead customers and somehow they get away with

011364-11/3557875 V1

this. Why do you think they're the biggest VA lender (almost double the origination of number 2) in the country where they aren't anywhere close to the top when it comes to all other loan types?"[38]

144. Former employees online have confirmed and corroborated these allegations. In a Reddit posting regarding this lawsuit two months ago, an anonymous poster stated the following (all typos in original):[39]

> Oh boy! I worked at Veterans United Realty (VUR) for several years and the steering is definitely a valid complaint. We were trained to threaten real estate agents if their clients chose to go with a lender that wasn't Veterans United. The wording we were given was very specific but the implications was obvious – we had to say things to the realtors like "We just want to make sure you're advocating for the loan officer" and imply we were turn off their realty referrals if it were a repeated issue.

145. The Reddit poster continued:

> Of course it wasn't their fault if the borrower chose to go with another lender, but **the goal was for them to push them towards VU as much as possible**. Alternate Lender Usage was actually a "secret metric" that we tracked and adjusted their referral eligibility accordingly. For example, if an agent received 5 referrals from Veterans United Realty, and 3 of them went with another lender, their referrals were likely to be adjusted to where they only got the crap online leads if at all.

146. Another comment under this post stated (presumably from the original poster), "To clarify, this practice is very much illegal and in violation of RESPA laws."

---

[38] *See* https://www.reddit.com/r/loanoriginators/comments/1jy6pql/comment/mn3od2e/ (lar visited May 1, 2026). Proof that Jerry Kindig is a loan officer is here: https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/2397823 (last visited May 4, 2026).

[39] *See* https://www.reddit.com/r/columbiamo/comments/1r9r7q0/class_action_lawsuit_filed_against_veterans_united/?solution=b4212b5a7afabd8db4212b5a7afabd8d&js_challenge=1&token=bbbe4bf1c9a2b5160829c4be34da58619b67f4d8155110e141ac8ae333b19023&jsc_orig_r=&solution=79980abe79aecddc79980abe79aecddc&js_challenge=1&token=bbbe4bf1c9a2b5160829c4be34da5861971684d66fa752c5c65ad7bec3767ce1&jsc_orig_r= (last visited May 4, 2026).

011364-11/3557875 V1

147. Another poster below this post stated "**I worked at VUR for a few years and I can 100% verify that this comment is correct. It's a huge part of why I left**."

148. In another Reddit posting, on the subreddit "r/Veterans," a user named "Kilrazin" posted[40] "I worked for Veterans United for over three years. I always tell Veterans to use someone else due to the shady and predatory practices VU uses." When another poster asked "What sort of predatory practices do you mean?", "Kilrazin" replied in part "VU focused heavily on PR and customer service. We were instructed to act like the Veteran was a family member even though they were nothing more than a cash cow. I understand VU is a corporation meant to generate funds and capital, but **the business practices of deceit, outright lying or talking veterans to go against their best judgment were too much for me**."

**F.    RESPA's Safe Harbor Does Not Apply**

149. Defendants cannot invoke RESPA's safe harbor provisions for affiliated businesses. The affiliate business arrangement does not apply because the network agents are independent contractors of Veterans United.[41] These agents do not have a formal and direct affiliate business arrangement with Veterans United Home Loans. 12 U.S.C. § 2607(c)(4); 12 U.S.C. § 2602(7). Accordingly, Veterans United Home Loans and Veterans United Realty gave things of value (referrals to agents) and accepted things of value (kickbacks and agents ensuring that clients used Veteran United Home Loans). This conduct is a clear violation of the § 2607(a) and its implementing regulation.

---

[40] https://www.reddit.com/r/Veterans/comments/1h0rllh/veterans_united/ (last visited May 4, 2026).

[41] As Veterans United Realty explained in response to a complaint about an agent, "the agent is not our employee, and she operates her own business[.]" Veterans United Realty, *Better Business Bureau* (2025), https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints (last visited May 4, 2026).

011364-11/3557875 V1

150. Defendants also cannot invoke RESPA's safe harbor provision for cooperative brokerages. The cooperative brokerage safe harbor does not permit payments between mortgage lenders and real estate agents for referrals. The cooperative brokerage safe harbor "refers only to fee divisions within real estate brokerage arrangements when all parties are acting in a real estate brokerage capacity, and has no applicability to any fee arrangements between real estate brokers and mortgage brokers or between mortgage brokers." 12 C.F.R. § 1024.14(g)(v). Veterans United Home Loans was a party to the referral scheme. Veterans United Home Loans is a mortgage lender, not a real estate broker. Moreover, the referral scheme did not relate only to actions taken in "real estate brokerage capacity" because the referrals involved mortgage lenders. Thus, the cooperative brokerage safe harbor cannot apply.

151. Veterans United provides agents in its referral network with an increased number of leads if they refer clients to Veterans United Home Loans. *See infra* § IV.D. Veterans United Realty specifically tells agents that they need to "reinforce existing relationships with the client's Loan officer," and this loan officer is from Veterans United Home Loans.[42]

152. As discussed above, referrals and commissions are a "thing of value." Regulation X, the implementing regulation for RESPA, clarifies that a thing of value includes "the opportunity to participate in a money-making program" and "commissions."[43] Referrals are not a return on ownership. In fact, payments that differ based on referral rates are impermissible even in affiliate business relationships.[44] An agent's income depends on commissions, and their commissions are directly tied to the amount of leads they get. Veterans United Realty provides its network agents

---

[42] *See* Agent Guidelines, *Veterans United Realty*, https://www.veteransunitedrealty.com/agent/guidelines/ (last visited May 4, 2026).

[43] 12 C.F.R. § 1024.14(d).

[44] 12 C.F.R. § 1024.15(b)(3)(ii).

011364-11/3557875 V1

with increased referrals, a thing of value, in exchange for agents referring clients to Veterans United Home Loans, a thing of value. Requiring agents to give referrals to Veterans United Home Loans to receive leads is evidence of an illegal steering scheme.

**G.     The Harmful and Long-Lasting Economic Impacts of Veterans United's Steering**

153.    Defendants' steering practice can have long-lasting impacts on the housing market. As one article described steering practices, "experts warn this apparent efficiency is masking a system designed to steer homebuyers to the platforms' own mortgage lenders, squeezing out competition and discouraging buyers from finding cheaper options."[45] According to this article, it is "part of massive consolidation and restructuring efforts by Zillow and Redfin's corporate owners to corner the trillion-dollar mortgage market, *which is already driving up housing costs and could heighten the risk of a financial crisis*." *Id.* (emphasis added). Although Zillow and Redfin are mentioned by name in this article, the description of the conduct applies equally to the Defendants.

154.    Defendants' illegal conduct can also have devastating impacts on buyers over the long run, particularly those saddled with a higher interest rate mortgage: "Unbeknownst to many consumers, shopping around for a home loan can save homebuyers an average of more than $80,000 over a thirty-year mortgage. In states like California, Hawaii, and Washington, lifetime savings can reach more than $100,000. Consumers who use real estate companies' in-house lenders may also be forced to pay higher fees and interest charges than those who use alternative options." *Id.* Agents steering clients exclusively to Veterans United Home Loans, as opposed to recommending multiple lenders and shopping around, had a negative financial impact on clients. Veterans United Home Loans operates from Missouri, so its loans are from the state of Missouri.

---

[45] Helen Santoro, "Zillow and Redfin May Be Steering Homebuyers Into Bad Deals," Jacobin (Sept. 16, 2025), https://jacobin.com/2025/09/zillow-redfin-mortgage-lending-competition (last visited May 4, 2026).

011364-11/3557875 V1

The steering of homebuyers to Veterans United Home Loans happened in violation of agents' fiduciary duties to their clients.

## V.     CLASS ACTION ALLEGATIONS

155.     Plaintiffs Christian Peyton, Salem Zahn, Ernest Easter, Bryan Dewar, Brandy Jackson, Donald Tumino, Jason Carson, Jennifer Miller, Lillian Norrs, Scott Brickey, Kobe Moye, Jared Flores, Dawn Jefferson, Jonathon Houser and Dawn Johnson bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following Class based on RESPA violations (12 U.S.C. § 2607(a)):

> All persons and entities in the United States who, from January 1, 2018, to the present, used Veterans United Home Loans to finance the purchase of a property.

156.     Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

157.     The Class is readily ascertainable because records of the relevant property transactions should exist and are easily obtainable.

158.     The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has at least hundreds of thousands of members, the exact number and their identities being known to Defendants.

159.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

160. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

a. Whether Defendants engaged in the alleged conduct;

b. Whether Defendants' conduct violates RESPA, as alleged herein;

c. Whether Defendants required agents to steer clients to use Veterans United Home Loans;

d. Whether Defendants provided agents with a "thing of value" in exchange for the referrals they provided to agents;

e. Whether Defendants altered the number of referrals sent to agents based on whether agents steered clients to use Veterans United Home Loans;

f. Whether Defendants operated an affiliated business arrangement with agents;

g. Whether Defendants provided properly formatted written disclosures of the affiliate relationship (if an affiliate relationship is found to exist);

h. Whether Veterans United Home Loan's terms and costs were inferior to other third-party options;

i. Whether Defendants' conduct led to their unjust enrichment;

j. Whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

k. Whether Defendants' conduct is unlawful; and

Case 2:26-cv-04039-WJE    Document 32    Filed 05/04/26    Page 76 of 104
011364-11/3557875 V1

l.       The appropriate class-wide measures of damages.

161.     Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiffs or to any particular Class.

162.     Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interest incompatible with the interests of the Class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

163.     A class action is the superior method for the efficient adjudication of this litigation because individual litigation would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint. Additionally, Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

164.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a.       The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to

011364-11/3557875 V1

individual Class members that would establish incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

c.   Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class and Steering Subclass members as a whole.

## VI.   TOLLING THE STATUTES OF LIMITATIONS

165.   As of the date of this Complaint, Defendants do not adequately disclose to potential buyers that they are not part of the VA or otherwise have any connection with the federal government. There was no reasonable way for the public, including Plaintiffs, to know that Defendants are simply a private, for-profit entity, who have no unique connections to the VA. Nor was there a reasonable way for the public to know about the undisclosed fees that Network Agents pay to Veterans United Realty. As a result, any applicable statutes of limitations or response are accordingly tolled.

166.   In addition, Defendants did not disclose to potential buyers that Veterans United Network Agents are required to steer buyers to Veterans United Home Loans. (Indeed, Defendants conceal the very existence and identity of these Network Agents.) There was no reasonable way for the public, including Plaintiffs, to know that Veterans United Home Loans required Network Agents to steer buyers back to Veterans United Home Loans, which offers a substandard product. As a result, Plaintiffs and other members of the public did not discover and reasonably could not

011364-11/3557875 V1

have discovered Defendants' RESPA violations and unjust enrichment. Any applicable statutes of limitations or response are accordingly tolled.

167. Further, and separate from the conduct giving rise to the RESPA violations themselves, Defendants engaged in affirmative acts of fraudulent concealment that delayed Plaintiffs' discovery of their claims. Specifically: (i) Defendants trained Veterans United Realty employees to use deliberately vague and misleading language when communicating with homebuyers so as to conceal the existence and purpose of the steering scheme (e.g., instructing agents to "reinforce relationships" rather than expressly directing them to refuse competing lenders); (ii) the AgentDash application's "Alternate Lender Usage" tracking metric was a "secret metric" not disclosed to homebuyers; (iii) the 35% kickback payments were not disclosed to homebuyers; and (iv) Defendants' systematic campaign of misleading advertising was calculated to prevent homebuyers from understanding that they were not dealing with, or receiving the services of, the actual VA.

## VII.   CLAIMS FOR RELIEF

### COUNT I:

### VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT, 12 U.S.C. § 2607(A) (ON BEHALF OF A NATIONWIDE CLASS)

168. Plaintiffs Christian Peyton, Bryan Dewar, Brandy Jackson, Donald Tumino, Jason Carson, Jennifer Miller, Lillian Norrs, Scott Brickey, Kobe Moye, Jared Flores, Dawn Jefferson, Jonathon Houser, and Dawn Johnson bring this action on behalf of themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

169. RESPA Section 8(a), 12 U.S.C. § 2607(a), provides that "no person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or

011364-11/3557875 V1

understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."

170. A "thing of value" is "broadly defined" under RESPA's implementing regulation by the CFPB under "Regulation X," and includes, among other things, "the opportunity to participate in a money-making program." 12 C.F.R. § 1024.14(d).

171. The real estate agents who receive referrals from Veterans United Realty treasure and rely on these referrals, and these agents consider Veterans United referrals as a thing of value. As a result, Veterans United referrals are a thing of value under RESPA.

172. The home loans originated by Veterans United Home Loans are a "business incident to or a part of a real estate settlement service" pursuant to RESPA Section 9; *see also* 12 C.F.R. § 1024.2(b) (defining "settlement service").

173. Regulation X defines a "referral" to include "any oral or written action directed to a person which has the effect of affirmatively influencing the selection by any person of a provider of a settlement service." 12 C.F.R. § 1024.14(f)(1). Moreover, "an agreement or understanding for the referral of business incident to or part of a settlement service need not be written or verbalized but may be established by a practice, pattern, or course of conduct." 12 C.F.R. § 1024.14(e).

174. In addition, "when a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business." 12 C.F.R. § 1024.14(e).

175. Pursuant to 12 U.S.C. § 2602(3), "the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: … the origination of a federally related mortgage loan."

011364-11/3557875 V1

176.    Pursuant to 12 C.F.R. § 1024.2(b), "Settlement Service means any service provided in connection with a prospective or actual settlement, including, but not limited to, any one or more of the following: (1) Origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of such loans) … [or] (3) Provision of any services related to the origination, processing or funding of a federally related mortgage loan."[46] Veterans United is accordingly a person under Section 8 of RESPA pursuant to 12 U.S.C. §§ 2602(5), 2607.

177.    Under these definitions, the mortgage lending services provided by Veterans United Home Loans for federally related loans were "settlement services" under RESPA.

178.    Veterans United Home Loans is a "creditor" pursuant to 15 U.S.C. § 1602(g), and as incorporated by reference into RESPA at 12 U.S.C. § 2602(1)(B)(iv). Veterans United Home Loans makes or invests in residential real estate loans totaling more than one million dollars per year. *See* 12 U.S.C. § 2602(1)(B)(iv).

179.    The vast majority of mortgages originated by Veterans United Home Loans during the Relevant Time Period were "federally related mortgage loans" as that term is defined by 12 U.S.C. § 2602(1) and 12 C.F.R. 1024.2(b).

180.    The real estate brokers and agents who received referrals from Veterans United Realty made the following referral to Veterans United Home Loans: they steered the Veterans United-referred clients to use Veterans United Home Loan for financing their home purchase in adherence with Veteran United's referral rules and quotas.

---

[46] *See also* 12 U.S.C. § 2602(3) ("the term 'Settlement services' includes any service provided in connection with a real estate settlement including, but not limited to, the following: [] services rendered by a real estate agent or broker").

011364-11/3557875 V1

181. Veterans United Realty therefore gave a "thing of value" to real estate brokers and agents—specifically, the actual and continued provision of client referrals, which Network Agents received repeatedly and in volume directly tied to their compliance with the steering scheme. The volume, regularity, and economic value of these referrals—which constituted a primary source of income for Network Agents—establishes that they were not speculative future benefits but actual, ongoing, and realized things of value.

182. Under 12 C.F.R. § 1024.14(e), "when a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business."

183. Thus, Defendants' repeated scheme of exchanging leads for steering and kickbacks is evidence of an agreement or understanding involving federally related mortgage loans to Veterans United Home Loans, in violation of RESPA Section 8(a), 12, U.S.C. § 2607(a).

## COUNT II:

### VIOLATION OF THE REAL ESTATE SETTLEMENT
### PROCEDURES ACT, 12 U.S.C. § 2607(B)
### (ON BEHALF OF A NATIONWIDE CLASS)

184. Plaintiffs Christian Peyton, Salem Zahn, Bryan Dewar, Brandy Jackson, Donald Tumino, Jason Carson, Jennifer Miller, Lillian Norrs, Scott Brickey, Kobe Moye, Jared Flores, Dawn Jefferson, Jonathon Houser, and Dawn Johnson bring this action on behalf of themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

185. The Real Estate Settlement Procedures Act ("RESPA") (codified at 12 U.S.C. § 2601, *et seq.*) was enacted in 1974 to provide consumers with greater and timelier disclosure of the nature and costs of the real estate settlement process and to protect them from abusive practices.

011364-11/3557875 V1

186. RESPA's premise was that complete disclosure of information would preclude illegal kickbacks, fee splits, unearned fees, and compensated referrals, and thereby empower the consumer to get the same or better services at a lower cost.

187. Section 7 of RESPA (12 U.S.C. § 2607) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

188. RESPA confers on the Secretary of the U.S. Department of Housing and Urban Development ("HUD") authority to prescribe rules and regulations to achieve the purposes of RESPA. The regulation adopted by HUD to fulfill its mandate is known as Regulation X, 24 C.F.R. § 3500, *et seq.*

189. RESPA achieves its goals in a twofold manner: by imposing disclosure requirements in connection with settlement services, and by prohibiting certain practices in connection with settlements.

190. The term "settlement services" includes any service provided in connection with a real estate settlement, including, but not limited to, providing brokerage services.

191. HUD has determined in its regulations that kickbacks, fee splits, and referral fees in connection with residential real estate sales are anticompetitive, result in harm to consumers, and thus illegal.

192. 24 C.F.R. § 3500.14 further explains the prohibitions in 12 U.S.C. § 2607 as follows:

> (b)     No referral fees. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving

011364-11/3557875 V1

a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

(c)     <u>No split of charges except for actual services performed</u>. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

(d)     <u>Thing of value</u>. This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term "payment" is used throughout Secs. 3500.14 and 3500.15 as synonymous with the giving or receiving any "thing of value'' and does not require transfer of money.

193.     The Plaintiffs' settlements of residential real estate purchases and sales were financed in whole or in part by federally related mortgage loans.

011364-11/3557875 V1

194. Defendants are real estate settlement services providers that provided real estate settlement services involving federally related mortgage loans within the meaning of 12 U.S.C. § 2602(2) and § 2607(a) for the settlements at issue.

195. In the alternative to the preceding allegation, Defendants are subject to RESPA because, by originating loans, it "provides business incident to or part of" a real estate settlement service and received settlement fees in connection therewith, within the meaning of 24 C.F.R. §§ 3500.2 and 3500.14, *et seq.*

196. In the alternative to the preceding allegation, each Defendant is also a person who received a split of commissions (other than for services performed) that were paid for the rendering of a settlement service in transactions involving federally related mortgage loans, within the meaning of 12 U.S.C. § 2607(a) and (b).

197. The Veterans United Network Agents who received real estate commissions from the subject settlements acquiesced in splitting those commissions with the Defendants by paying the undisclosed 35% fees ("kickbacks") in connection with real estate settlements involving federally related mortgage loans.

198. Defendants accepted the kickbacks either as a settlement services provider, a purported provider of services incident to or part of a real estate settlement service, or a person within the meaning of 12 U.S.C. § 2607, *et seq.*

199. Payment and receipt of the kickback violated 12 U.S.C. § 2607(b) in that it represents a split of commissions paid without rendering any settlement services in connection

with a federally related mortgage loan. As Defendants acknowledged, "We operate a referral network, and such were not a party to the [property] transaction."[47]

200.    Defendants collect the unearned kickbacks from settlement proceeds *only* when a listed property sells.

201.    The kickbacks are paid from settlement proceeds after all real estate settlement services have been rendered. The kickbacks serve no legitimate purpose and are an illegal fee for which Defendants perform no services.

202.    Defendants' unlawful conduct deprived Plaintiffs and Class Members of impartial and independent advice in connection with their real estate transactions, restricted competition among real estate agents and mortgage lenders, and distorted the market for real estate settlement services. As a result, consumers were steered through conflicted referral arrangements and subjected to undisclosed financial incentives that undermined transparency, consumer choice, and inflated the purchase price of homes.

203.    As a direct and proximate result of Defendants' violations of the Real Estate Settlement Procedures Act, Plaintiffs and Class members were charged, and paid, unlawful and unearned settlement amounts in connection with federally related mortgage loan transactions. Plaintiffs and Class members were injured by the payment of these unlawful charges and are entitled to all relief available under RESPA.

204.    Additionally, the costs of the kickback scheme were embedded in higher origination fees, higher interest rates, and inflated loan costs and amounts, all of which Plaintiffs paid directly to Defendants as charges for settlement services. These charges were inflated as a

---

[47] https://www.bbb.org/us/mo/columbia/profile/real-estate/veterans-united-realty-0734-310414921/complaints.

011364-11/3557875 V1

direct result of the unlawful referral and kickback scheme, rendering them "unearned" within the

meaning of Section 8(b).

205. Each Defendant is jointly and severally liable to Plaintiffs pursuant to 12 U.S.C. § 2607(d)(2) in an amount equal to three times the kickbacks, together with reasonable attorneys' fees, costs, equitable or ancillary relief the Court finds appropriate to prevent ongoing violations, remedy unjust enrichment, and deter similar conduct in the future. 12 U.S.C. § 2607(d).

**COUNT III:**

**VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT
(MO. REV. STAT. § 407.010, *ET SEQ.*)
(ON BEHALF OF A NATIONWIDE CLASS, OR ALTERNATIVELY
ON BEHALF OF A MISSOURI CLASS)**

206. Plaintiff Scott Brickley brings this claim on behalf of himself and on behalf of the Missouri Class against Defendants. Plaintiff Scott Brickley repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

207. Each Plaintiff and each Defendant are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

208. Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

209. The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. "Merchandise" is defined to include "real estate or services." *Id.* § 407.010(4).

210. The MMPA authorizes class actions, brought on behalf of private causes of action. Mo. Rev. Stat. § 407.025.

211.     Plaintiff purchased real estate services, loan services, and other services from the Defendants.

212.     As detailed herein, Defendants' conduct was unfair and deceptive. Among other acts, Defendants, acting from within the state of Missouri, deliberately steered clients to use Veterans United Home Loans, despite knowing that it offered loans that were more costly and had higher interest rates. Defendants also used its name and website as part of its marketing campaign, developed and disseminated from the state of Missouri by Defendant Realty Search Solutions, LLC, to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity. Defendants, including Defendants Realty Search Solutions Network, LLC, and acting and operating within the state of Missouri, further failed to disclose the hidden kickback payments that the Network Agents paid to Veterans United, which a reasonable person would have deemed material. Defendants further obtained and retained the ill-gotten gains within the state of Missouri

213.     Defendants had a duty to disclose (i) its unlawful steering; (ii) its affiliation as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments because:

214.     Veterans United Realty real estate agents had a fiduciary duty of loyalty and full disclosure to their clients. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice, including any financial incentives to steer clients to Veterans United Home Loans.

215.     Defendants had exclusive knowledge of their steering scheme and their hidden kickback payments scheme.

216.     Defendants knew that they were engaged in a campaign of false advertising.

011364-11/3557875 V1

217.    Defendants intentionally concealed the foregoing from Plaintiffs and the Class.

218.    Defendants made incomplete representations regarding (i) its unlawful steering; (ii) its status as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

219.    Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants conduct in that Plaintiffs and the other Class members overpaid for their mortgages and settlement services. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

220.    The ascertainable loss includes, but is not limited to, the difference between the value of the settlement services and mortgage as falsely represented and the actual, inflated services received. This includes: (i) interest rates above market; (ii) origination fees and closing costs exceeding market rates by $5,000–$10,000 per loan; and (iii) the cost premium embedded in the transaction as a result of the undisclosed 35% kickback arrangement. These losses are ascertainable with particularity based on loan documents obtainable through discovery.

221.    Defendants' violations of the MMPA were willful and knowing.

222.    A Nationwide Class is appropriate here, because the MMPA has an "extremely wide scope" and is not limited to "consumer victims domiciled within Missouri or to business transacted entirely within the state's territorial borders." *State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 800 (Mo. Ct. App. 2003). Further, the deceptive conduct alleged herein was used and employed "in connection with the sle or advertisement of any merchandise … in or from the state of Missouri," thereby making it unlawful. *Id.* (citing Mo. Rev. Stat. § 407.020.1). As noted above "merchandise" includes "real estate or services." Mo. Rev. Stat. § 407.010(4).

011364-11/3557875 V1

223. In the alternative, Plaintiffs bring these claims on behalf of a Missouri state Class.

224. Plaintiffs accordingly seek actual damages, declaratory relief, disgorgement of profits from Defendants' unlawful conduct, punitive damages, and attorneys' fees and costs.

**COUNT IV:**

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A)
(ON BEHALF OF AN ILLINOIS CLASS)**

225. Plaintiffs Jennifer Miller and Kobe Moye bring this claim on behalf of themselves and on behalf of an Illinois Class against Defendants. Plaintiffs Jennifer Miller and Kobe Moye incorporate by reference all paragraphs as though fully set forth herein.

226. Each Defendant is a "person" as that term is defined in 815 ILCS 505/1(c).

227. Plaintiffs and the Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

228. The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

229. Plaintiffs purchased real estate services, loan services, and other services from the Defendants.

230. As detailed herein, Defendants' conduct was unfair and deceptive. Among other acts, Defendants deliberately steered clients to use Veterans United Home Loans, despite knowing

that it offered loans that were more costly and had higher interest rates. Defendants also used its name and website to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity. Defendants further failed to disclose the hidden kickback payments that the Network Agents paid to Veterans United, which a reasonable person would have deemed material.

231. Defendants had a duty to disclose (i) its unlawful steering; (ii) its affiliation as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments because:

232. Veterans United Realty real estate agents had a fiduciary duty of loyalty and full disclosure to their clients. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice, including any financial incentives to steer clients to Veterans United Home Loans.

233. Defendants had exclusive knowledge of their steering scheme and their hidden kickback payments scheme.

234. Defendants knew that they were engaged in a campaign of false advertising.

235. Defendants intentionally concealed the foregoing from Plaintiffs and the Class.

236. Defendants made incomplete representations regarding (i) its unlawful steering; (ii) its status as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

237. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants conduct in that Plaintiffs

011364-11/3557875 V1

and the other Class members overpaid for their mortgages and settlement services. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

238. The ascertainable loss includes, but is not limited to, the difference between the value of the settlement services and mortgage as falsely represented and the actual, inflated services received. This includes: (i) interest rates above market; (ii) origination fees and closing costs exceeding market rates by $5,000–$10,000 per loan; and (iii) the cost premium embedded in the transaction as a result of the undisclosed 35% kickback arrangement. These losses are ascertainable with particularity based on loan documents obtainable through discovery.

239. Defendants' unlawful acts and practices complained of herein affect the public interest.

240. Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Class members seek monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or was grossly negligent.

241. Plaintiffs also seek attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq.*

### COUNT V:

### VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349
### (N.Y. GEN. BUS. LAW § 349))
### (ON BEHALF OF A NEW YORK CLASS)

242. Plaintiff Lillian Norrs brings this claim on behalf of herself and on behalf of a New York Class against Defendants. Plaintiff Lillian Norrs incorporates by reference all paragraphs as though fully set forth herein.

243. Plaintiffs are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

011364-11/3557875 V1

244. Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

245. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Defendants' deceptive acts and practices, which were intended to mislead consumers in a material way in the process of using Veterans United Realty and/or Veterans United Home Loans, constitute conduct directed at consumers and "consumer-oriented." Further, Plaintiffs and other Class members suffered injury as a result of the deceptive acts or practice.

246. Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

247. Plaintiffs purchased real estate services, loan services, and other services from the Defendants.

248. As detailed herein, Defendants' conduct was unfair and deceptive. Among other acts, Defendants deliberately steered clients to use Veterans United Home Loans, despite knowing that it offered loans that were more costly and had higher interest rates. Defendants also used its name and website to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity. Defendants further failed to disclose the hidden kickback payments that the Network Agents paid to Veterans United, which a reasonable person would have deemed material.

011364-11/3557875 V1

249. Defendants had a duty to disclose (i) its unlawful steering; (ii) its affiliation as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments because:

250. Veterans United Realty real estate agents had a fiduciary duty of loyalty and full disclosure to their clients. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice, including any financial incentives to steer clients to Veterans United Home Loans.

251. Defendants had exclusive knowledge of their steering scheme and their hidden kickback payments scheme.

252. Defendants knew that they were engaged in a campaign of false advertising.

253. Defendants intentionally concealed the foregoing from Plaintiffs and the Class.

254. Defendants made incomplete representations regarding (i) its unlawful steering; (ii) its status as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

255. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants conduct in that Plaintiffs and the other Class members overpaid for their mortgages and settlement services. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

256. The ascertainable loss includes, but is not limited to, the difference between the value of the settlement services and mortgage as falsely represented and the actual, inflated services received. This includes: (i) interest rates above market; (ii) origination fees and closing costs exceeding market rates by $5,000–$10,000 per loan; and (iii) the cost premium embedded in

011364-11/3557875 V1

the transaction as a result of the undisclosed 35% kickback arrangement. These losses are ascertainable with particularity based on loan documents obtainable through discovery.

257. Defendants' unlawful and deceptive acts and practices complained of herein impact the public interest.

258. Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiffs and each Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendants' willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under the New York GBL.

**COUNT VI:**

**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(OHIO REV. CODE § 1345.01 *ET SEQ.*)**
**(ON BEHALF OF AN OHIO CLASS)**

259. Plaintiffs Donald Tumino and Jonathon Houser bring this claim on behalf of themselves and on behalf of an Ohio Class against Defendants. Plaintiffs Donald Tumino and Jonathon Houser incorporate by reference all paragraphs as though fully set forth herein.

260. Plaintiffs and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("Ohio CSPA").

261. Each Defendant is a "supplier" and a "seller" as defined by the Ohio CSPA.

262. Plaintiffs' and the other Ohio Class members' property purchases and mortgage acquisitions are "consumer transactions" as defined by the Ohio CSPA.

263. The Ohio CSPA, Ohio Rev. Code § 1345.02, broadly prohibits "an unconscionable act or practice in connection with a consumer transaction." Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing "(1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or

benefits that it does not have; [and] (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code § 1345.02. Defendants' conduct as alleged above and below constitutes unfair and unconscionable acts or practices in consumer sales transactions in violation of Ohio Rev. Code § 1345.02.

264. Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

265. Plaintiffs purchased real estate services, loan services, and other services from the Defendants.

266. As detailed herein, Defendants' conduct was unfair and deceptive. Among other acts, Defendants deliberately steered clients to use Veterans United Home Loans, despite knowing that it offered loans that were more costly and had higher interest rates. Defendants also used its name and website to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity. Defendants further failed to disclose the hidden kickback payments that the Network Agents paid to Veterans United, which a reasonable person would have deemed material.

267. Defendants had a duty to disclose (i) its unlawful steering; (ii) its affiliation as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments because:

268. Veterans United Realty real estate agents had a fiduciary duty of loyalty and full disclosure to their clients. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice, including any financial incentives to steer clients to Veterans United Home Loans.

011364-11/3557875 V1

269. Defendants had exclusive knowledge of their steering scheme and their hidden kickback payments scheme.[48]

270. Defendants knew that they were engaged in a campaign of false advertising.

271. Defendants intentionally concealed the foregoing from Plaintiffs and the Class.

272. Defendants made incomplete representations regarding (i) its unlawful steering; (ii) its status as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

273. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants conduct in that Plaintiffs and the other Class members overpaid for their mortgages and settlement services. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

274. The ascertainable loss includes, but is not limited to, the difference between the value of the settlement services and mortgage as falsely represented and the actual, inflated services received. This includes: (i) interest rates above market; (ii) origination fees and closing costs exceeding market rates by $5,000–$10,000 per loan; and (iii) the cost premium embedded in the transaction as a result of the undisclosed 35% kickback arrangement. These losses are ascertainable with particularity based on loan documents obtainable through discovery.

275. Defendants' unlawful and deceptive acts and practices complained of herein impact the public interest.

---

[48] Defendants were sufficiently on notice that their conduct was deceptive or unconscionable. *See e.g.*, PIF Number 10002646, https://opif.ohioattorneygeneral.gov/opifimages/PIF2646.pdf (last visited May 4, 2026).

011364-11/3557875 V1

276. Plaintiffs seek actual damages, plus an amount not exceeding $5,000 in noneconomic damages, an order enjoining Defendants' deceptive and unfair conduct, court costs and attorneys' fees as a result of Defendants' violations of the Ohio CSPA as provided in Ohio Rev. Code § 1345.09.

**COUNT VII:**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA")**
**(TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)**
**(ON BEHALF OF A TEXAS CLASS)**

277. Plaintiffs Salem Zahn and Jared Flores bring this claim on behalf of themselves and on behalf of a Texas Class against Defendants. Plaintiffs Salem Zahn and Jared Flores incorporate by reference all paragraphs as though fully set forth herein.

278. Plaintiffs assert this Count individually and on behalf of the Class against Defendants.

279. Plaintiffs assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46.

280. Plaintiffs are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.46(4).

281. Each Defendant engaged in "trade or commerce" within the meaning of the DTPA.

282. The DTPA prohibits "false, misleading, or deceptive acts or services in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a).

283. Defendants' actions, as set forth above, occurred in the conduct of business, trade or commerce.

011364-11/3557875 V1

284. Plaintiffs purchased real estate services, loan services, and other services from the Defendants.

285. As detailed herein, Defendants' conduct was unfair and deceptive. Among other acts, Defendants deliberately steered clients to use Veterans United Home Loans, despite knowing that it offered loans that were more costly and had higher interest rates. Defendants also used its name and website to present itself as being part of or affiliated with the VA, when in fact each Defendant is a private for-profit entity. Defendants further failed to disclose the hidden kickback payments that the Network Agents paid to Veterans United, which a reasonable person would have deemed material.

286. Defendants had a duty to disclose (i) its unlawful steering; (ii) its status as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments because:

287. Veterans United Realty real estate agents had a fiduciary duty of loyalty and full disclosure to their clients. These duties require agents to act solely in their clients' best interests and to avoid or disclose any conflicts that could compromise impartial advice, including any financial incentives to steer clients to Veterans United Home Loans.

288. Defendants had exclusive knowledge of their steering scheme and their hidden kickback payments scheme.

289. Defendants knew that they were engaged in a campaign of false advertising.

290. Defendants intentionally concealed the foregoing from Plaintiffs and the Class.

291. Defendants made incomplete representations regarding (i) its unlawful steering; (ii) its affiliation as a private, for-profit business with no affiliation with the VA; and (iii) its hidden kickback payments, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

011364-11/3557875 V1

292. Plaintiffs reasonably relied on Defendants' false representations, including statements from Veterans United Home Loans and Veterans United Realty that implied they were part of the VA or affiliated with the VA.

293. Plaintiffs and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants conduct in that Plaintiffs and the other Class members overpaid for their mortgages and settlement services. These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

294. The ascertainable loss includes, but is not limited to, the difference between the value of the settlement services and mortgage as falsely represented and the actual, inflated services received. This includes: (i) interest rates above market; (ii) origination fees and closing costs exceeding market rates by $5,000–$10,000 per loan; and (iii) the cost premium embedded in the transaction as a result of the undisclosed 35% kickback arrangement. These losses are ascertainable with particularity based on loan documents obtainable through discovery.

295. Defendants' unlawful and deceptive acts and practices complained of herein impact the public interest.

296. Plaintiffs and Class members seek monetary relief against Defendants pursuant to Tex. Bus. & Com. Code §§ 14.41, *et seq.* Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and mental anguish damages and additional damages up to three times the amount of economic damages as permitted by the DTPA.

**COUNT VIII:**

**UNJUST ENRICHMENT**
**(ON BEHALF OF A NATIONWIDE CLASS)**

297. Plaintiffs Christian Peyton, Salem Zahn, Ernest Easter, Bryan Dewar, Brandy Jackson, Donald Tumino, Jason Carson, Jennifer Miller, Lillian Norrs, Scott Brickey, Kobe Moye,

Jared Flores, Dawn Jefferson, Jonathon Houser, and Dawn Johnson bring this claim for themselves and on behalf of the Nationwide Class against Defendants. Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

298. As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of referral fee payments by agents and profits from mortgages to which Class members were improperly steered and induced.

299. In so doing, Defendants acted with conscious disregard for the rights of Plaintiffs and members of the Class.

300. As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

301. The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

302. Defendants either knew or should have known that referral fee payments by Agents and profits from mortgages that Class members were steered towards were obtained improperly. As such, it would be inequitable for Defendants to retain the benefit of the referral fee payments by Agents and profits from mortgages that Class members were steered towards.

303. The financial benefits derived by Defendants from referral fee payments by Agents and profits from mortgages that Class members were steered towards rightfully belong to Plaintiffs and Class members.

304. Defendants' acceptance and retention of the referral fee payments by Agents and profits from mortgages that Class members were steered towards under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to

011364-11/3557875 V1

Plaintiffs and Class members. Plaintiffs and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in their favor and against Defendants, as follows:

A.     Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiffs as the representatives of the Class;

B.     Enter joint and several judgments against the Defendants and in favor of Plaintiffs and the Class;

C.     Award the Class damages in an amount to be determined at trial;

D.     Permanently enjoin Defendants' ongoing unlawful conduct;

E.     Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.     Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

011364-11/3557875 V1

DATED: May 4, 2026          Respectfully submitted,

**BOULWARE LAW LLC**

By: /s/ *Brandon J.B. Boulware*
        Brandon J.B. Boulware, MO #54150
Jeremy M. Suhr, MO #60075
Kevin D. Thomson, MO #78346
1600 Genessee, Suite 760
Kansas City, MO 64102
Tel/Fax: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
kevin@boulware-law.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ *Steve W. Berman*
Steve W. Berman (*pro hac vice*)
Jerrod C. Patterson (*pro hac vice*)
Amna Amin (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jerrodp@hbsslaw.com
amna.amin@hbsslaw.com

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2026, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ Steve W. Berman
Steve W. Berman (*pro hac vice*)

011364-11/3557875 V1